Chicago and Eastern Illinois Railroad Company

*v.*

George F. Jennings, Admr.

*Opinion filed June 19, 1901.*

1. Carriers—*what will create relation of carrier and passenger is a question of law.* What facts will create the contract relation of carrier and passenger is a question of law, and when the existence of such relation is in controversy it is the duty of the court to give a proper instruction presented by a party, informing the jury what facts will be sufficient evidence of the contract.

2. Same—*carrier owes highest degree of care to passengers.* A carrier owes to its passenger the highest practicable degree of care, and slight negligence is such a breach of that duty as will render it liable; but the responsibility for this degree of care, and the liability for failure to exercise it, do not begin until the contract relation begins.

3. Same—*person must have placed himself under carrier's control.* To entitle a person to the rights of a passenger he must have so placed himself under the care of the railroad company that the circumstances will warrant an understanding on the part of the company that he is a passenger and under its control as such.

4. Same—*mere fact that person has ticket and intends to take train does not make him a passenger.* The mere fact that a person has a ticket and intends to take a train does not create the relation of carrier and passenger, since it is further necessary that he be at some place under the control of the carrier and provided for passengers.

5. Same—*person is not a passenger until he reaches some place provided for passengers.* So long as a person merely intends to be carried, but has not reached any place provided for passengers or used for their accommodation, he is not a passenger.

Magruder and Carter, JJ., dissenting.

*C. & E. I. R. R. Co.* v. *Jennings,* 89 Ill. App. 335, reversed.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. Murray F. Tuley, Judge, presiding.

S. A. Lynde, (W. H. Lyford, of counsel,) for appellant.

Edward J. Dahms, and Wing & Chadbourne, for appellee.

Mr. Justice Cartwright delivered the opinion of the court:

Appellee brought this suit as administrator of the estate of George M. Jennings, who was killed by one of appellant's trains while crossing its tracks at Seventy-sixth street, in the city of Chicago, to recover damages from appellant for his death.

The declaration contains five counts, in each of which it is averred that the defendant received said George M. Jennings upon its premises as a passenger at or upon the intersection and crossing of its railroad and Seventy-sixth street, and near to its Seventy-sixth street depot, to be safely carried from thence to its Dearborn street station, in the city of Chicago, upon a train about to arrive at and stop and wait at said Seventy-sixth street station or depot to receive said George M. Jennings and other passengers, to convey and carry them to their several destinations. Each of said counts also alleges, in substance, that it thereupon became the duty of defendant to have permitted the said George M. Jennings to safely cross over its railroad tracks while going to said depot, and to have allowed and permitted him to safely take and mount said train of cars which was about to arrive and stop at said station and to have carefully conveyed and carried him to his said destination, but that while he was, with all due care and diligence, walking upon and across said Seventy-sixth street at said crossing of the same and defendant's railroad to reach and mount defendant's train, the defendant, by its servants, disregarding said duty, ran another train in a southerly direction upon and over the said crossing, and struck the said George M. Jennings and killed him. While the counts are substantially alike in making the foregoing allegations, they differ in respect to the character of the neg-

ligence charged as a breach of said duty. In the first, there is a general charge that the train which struck Jennings was carelessly, negligently and improperly driven, managed and run. The second count charges that said train was carelessly and negligently driven and run at an unlawful rate of speed, in violation of an ordinance of the city of Chicago set out in that count. The third alleges that the defendant ran the train without maintaining a flagman upon the street crossing to warn said George M. Jennings of trains. The fourth charged defendant with not ringing the bell or blowing a whistle on the engine eighty rods from the crossing and until the crossing was reached, as was required by the statute. The fifth alleges that defendant failed to ring a bell in its tower or tower-house near the crossing, to warn said George M. Jennings of the approach of the train. Each count was based upon the existence of the contract relation of passenger and carrier, and alleged duties arising out of that relation, and charged as breaches of that duty the several acts above stated. There was no count alleging any relation or duty except as carrier and passenger, nor any negligent act except as a breach of such duty, and there was no count of which the averment of that relation was not a necessary element. The defendant pleaded the general issue, and there was a trial resulting in a verdict for $4800, and a judgment thereon, which has been affirmed by the Appellate Court.

The following facts were proved by the plaintiff and not disputed by the defendant, but are conceded: The defendant owns and operates a railroad in the city of Chicago, with a station at the corner of Polk and Dearborn streets. It also has a station at Seventy-sixth street. That street runs east and west and the tracks run north and south, crossing it at right angles. At that place there are four tracks, and the depot is on the east side of them and north of the street. The two easterly tracks nearest the depot are used for passenger trains.

The first track to the east is No. 1, and the trains running on that track are north-bound passenger trains. The second track from the east is No. 2, on which south-bound passenger trains run. The two tracks to the west of these are for north and south-bound freight trains. There is a sidewalk running east and west on the north side of Seventy-sixth street, and east of all the tracks there is a wooden platform running north from the sidewalk about one hundred feet. At the north end the platform is ten feet wide, and at the south end it runs over to the depot and is probably eighteen feet wide. Between the passenger tracks Nos. 1 and 2 there is another platform eight feet wide, running north from the sidewalk one hundred feet. These platforms are level and even with the top of the rails, and are for the use of passengers. The street crossing is planked in the usual manner entirely across the tracks. In 1894 there was a train which went north from this station at 7:37 in the morning, and George M. Jennings was in the habit of taking that train, and other passengers were in the habit of taking trains at that station for down town every morning. On the morning of April 16, 1894, Mr. Jennings walked across lots from his home west of the railroad to take this train. He came to the Seventy-sixth street crossing and walked along the sidewalk over the freight car tracks. The train going north which he intended to take was on the farther track, just drawing up to the station, and was entirely stopped or was in the act of stopping. He was looking to the east or south-east toward that train and away from a passenger train which was approaching from the north on track No. 2. As he reached track No. 2, on which the south-bound passenger train was coming, and had stepped one foot over the west rail, he was struck by that train and killed. He had not reached any platform provided for passengers, or a point where such platform connected with the sidewalk that he was on, or any place where passengers were accustomed to get

190—31

upon the train. He had a commutation ticket in his pocket, which was still good for one ride.

The charges of negligence and the allegation of due care on the part of Jennings were in controversy at the trial, but the bill of exceptions shows that the principal dispute was as to whether Jennings had become a passenger on defendant's railroad. On that question the defendant asked the court to give to the jury five instructions as to what facts were necessary to prove the averment that Jennings was a passenger, and four of them required proof of that averment to authorize a recovery under the declaration. The general purport of these instructions was that Jennings would not become a passenger or be received by the defendant as a passenger until he should have reached the station or platform for the purpose of taking such train or the point where passengers were in the habit of getting on such train; and the fifth was as follows:

"The plaintiff in this case has alleged in his declaration that Jennings was received by the defendant as a passenger, and in order to recover under this declaration the plaintiff must prove, by a preponderance of the evidence, that the relation of passenger and carrier existed between Jennings and the defendant when he was struck by the defendant's engine. As a matter of law, the court instructs the jury that a person does not become a passenger until he has in some way placed himself under the care and control of the carrier and has been expressly or impliedly received as a passenger by the carrier, and that the fact, if it be a fact, that Jennings was on his way to defendant's station for the purpose and with the intention of taking the defendant's train into the city is not sufficient to make him a passenger and create the relation of passenger towards the defendant, and that relation would not commence and he would not be received as a passenger until he should reach the defendant's station or platform or point where he intended to take its train."

The court refused to give any of these instructions, and did not give any which covered the same ground, or give the jury any information as to what proof was required to sustain the averment that Jennings had become a passenger. The jury were left without any guide as to the law on that subject.

What facts will create the contract relation of carrier and passenger is a question of law, and when the existence of such relation is in controversy, it is the duty of the court to give a proper instruction presented by a party, informing the jury what facts will be sufficient evidence of the contract. Peculiar duties and liabilities on the part of the carrier arise out of and are based on the existence of such contract. There is a wide difference between the liability of a railroad company to persons on street crossings or on its premises who are not passengers and its liability to its passengers. A railroad company owes to its passenger the highest practicable degree of care in transporting him and in the management and operation of its trains, and slight negligence is such a breach of that duty as will render it liable. If Jennings was a passenger the defendant owed to him the highest degree of care and prudence to carry him to his destination, to protect him from injuries from its servants and trains, and to afford him a reasonable opportunity to leave the train with safety. (*Pennsylvania Co.* v. *McCaffrey*, 173 Ill. 169.) The responsibility for this degree of care and the liability for a failure to exercise it begin when the contract relation begins. It is not necessary, to create the relation, that the passenger should have entered a train, but if he is at the place provided for passengers, such as the waiting room or platform at the station, with the intention of taking passage and has a ticket, he is entitled to all the rights and privileges of a passenger. A railroad company owes a general duty to receive and carry those who present themselves at the time and place provided for passengers requiring trans-

portation. In *Chicago and Alton Railroad Co.* v. *Wilson*, 63 Ill. 167, Wilson, after purchasing a ticket for a train, was standing on a platform constructed by the railroad company for the convenience of passengers between the main track and a switch track. He was waiting for the passengers to alight from the train upon which he expected to take passage, when he was struck and injured by another train. The court regarded him as a passenger and held the company liable for the character of the platform. In *North Chicago Street Railroad Co.* v. *Williams*, 140 Ill. 275, it was held that the contract constituting the relation of carrier and passenger might be implied from the attempt of Williams to enter, in a proper manner, a street car as a passenger, with the intention of being transported thereon.

When the passenger has presented himself at the proper place to be transported, his right to care and protection begins. (Cooley on Torts, 653.) But it is uniformly held that the passenger must have placed himself under the care of the railroad company, so that the circumstances will warrant an understanding on the part of the company that he is a passenger and under its care as such. Although it is not necessary that fare should have been paid or an express contract made, it is necessary that a person should be under the control of a carrier in order to be entitled to its care as a passenger. (2 Wood on Railway Law, 1037.) He must be at some place under the control of the carrier and provided for passengers, so that it may exercise the high degree of care exacted from it; and the mere fact that an intending passenger has a ticket and intends to take a train does not create the relation of carrier and passenger. In 5 Am. & Eng. Ency. of Law, (2d ed.) 488, the time when that relation begins is stated as follows: "The relation of carrier and passenger begins when one puts himself in the care of the carrier or directly within its control with the *bona fide* intention of becoming a passenger and is accepted as

such by the carrier.   Seldom, however, is there any for·
mal act of delivery of the passenger's person into the
care of the carrier or of acceptance by the carrier of one
who presents himself for transportation, hence the ex-
istence of the relation is commonly to be implied from the
circumstances attendant.   The rule is, that these circum-
stances must be such as will warrant an implication that
one has offered himself to be carried, and that the offer
has been accepted by the carrier."

In Elliott on Railroads (sec. 1579) it is said:  "A per-
son may become a passenger before he has entered the
train or vehicle of the carrier.   We think it safe to say
that a person becomes a passenger when, intending to
take passage, he enters a place provided for the recep-
tion of passengers, as a depot, waiting room or the like,
at a time when such a place is open for the reception of
persons intending to take passage on the trains of the
company."   In section 1581 the author says:  "The rela-
tion cannot exist unless the person claiming to be a pas-
senger has been impliedly or expressly received as such
by the carrier."

In *June* v. *Boston, etc. Railroad Co.* 153 Mass. 79, a per-
son was walking toward the station on a plank walk on
the premises of the railroad company, intending to take
a train, and was struck by another train.   The court held
that he was not a passenger, and said that argument was
not necessary to show that a man walking toward a rail-
road station with the intention of buying a ticket and
taking a train after he got there was not a passenger,
even if he might be in the same place if he had begun his
journey.   If the relation has never been entered into, the
question is not the same as where a passenger may right-
fully be without ceasing to be a passenger after the re-
lation has been assumed.

In *Webster* v. *Fitchburg Railroad Co.* 161 Mass. 298, plain-
tiff alleged that her intestate was a passenger on de-
fendant's railroad.   The evidence was that he had in his

pocket a ten-trip ticket between Boston and the station where the accident happened. He was running from the street across the company's tracks on its premises to catch a train about to start, when he was struck and killed by another train. The court held that he had not become a passenger, and said: "One becomes a passenger on a railroad when he puts himself into the care of the railroad company, to be transported under a contract, and is received and accepted as a passenger by the company. There is hardly ever any formal act of delivery of one's person into the care of the carrier or of acceptance by the carrier of one who presents himself for transportation, and so the existence of the relation of passenger and carrier is commonly to be implied from circumstances. These circumstances must be such as to warrant an implication that the one has offered himself to be carried on a trip about to be made, and that the other has accepted his offer and has received him to be properly cared for until the trip is begun, and then to be carried over the railroad."

In *Illinois Central Railroad Co.* v. *O'Keefe*, 168 Ill. 115, plaintiff's intestate got upon the train after it had left the station and platform and at a place not provided for passengers. We held, in accordance with the authorities, that a passenger must put himself in the care of the railroad company, and there must be something from which it may fairly be implied that the company had accepted him as a passenger.

Since a railroad company owes the duty of protection to its passengers, it seems plain that the circumstances must be such that the company will understand that such a person is a passenger in its care and entitled to its protection. The company certainly has a right to know that the relation and duty exist, and the passenger must be at some place provided by the company for passengers, or some place occupied or used by them in waiting for or getting on or off trains. Whenever a person goes into

such a place with the intention of taking passage, he may fairly expect that the company will understand that he is a passenger and protect him. If he could be a passenger before reaching such a place there would be no limit or place where it could be said that he became a passenger. The intention of taking a train would only prove a purpose to enter into the contract relation, but would not create it. Any person walking toward a train on a public sidewalk might have no intention whatever of taking the train but might have an intention to keep on along the street. So long as a person merely intends to be carried but has not reached any place provided for passengers or used for their accommodation he is not a passenger. Counsel for appellee have not found any authority holding differently from those above cited, and all the authorities seem to be in accord on the question.

Appellee, however, insists that even if the relation of passenger and carrier alleged in the declaration was not proved, it was not so material as to require absolute proof; that the evidence justified a finding that defendant was guilty of negligence in failing to observe its common law duty of ordinary care not to injure a person on a street crossing; that it failed to exercise such ordinary care as it would owe to Jennings if he was not a passenger, and that it could not have been harmed by the refusal of the instructions. Even if it were true that a recovery might be had, under the declaration, by proof of a different relation and duty from those alleged in the declaration, it would not justify the refusal of the court to inform the jury what would create the relation of carrier and passenger and impose upon the defendant the highest degree of care and diligence for the safety of Jennings. The third instruction refused was of that character. If that were the case, the rights and duties of the parties would be presented to the jury in two aspects, with different duties and liabilities. If Jennings was not a passenger and his rights grew out of the fact that

he was crossing a street at an intersection of defendant's railroad the defendant would be bound to exercise toward him ordinary care, while if he was a passenger it would owe him the highest degree of care. The jury would be called upon to determine the liability of the defendant upon entirely different grounds, and might conclude that the defendant exercised ordinary care but not the highest degree of care. The rule, however, is fundamental that a plaintiff must recover, if at all, upon the case made by his declaration, (*Chicago and Eastern Illinois Railroad Co.* v. *Driscoll*, 176 Ill. 330,) and under the declaration the allegation in question was a material one. There was no count upon the common law duty of a railroad company arising out of its relations to a person crossing a street over its tracks or resting on a relation of that kind. Every count was based on the contract relation, and plaintiff was bound to prove it. The defendant did not, in any manner, waive its rights in that respect or fail to opportunely object to a variance. The objection was continually made in the course of the trial, as appears from the bill of exceptions. Evidence as to the use of the platform between the two tracks and the possession of the commutation ticket by Jennings was objected to as an attempt to make a different case, and because the evidence already showed that he was not a passenger. The defendant also moved to direct a verdict for it because there was no proof that Jennings was a passenger or had been received as such, and that the proof was at variance with the declaration. The objection of variance was never waived, but was insisted upon throughout the trial and by asking the instructions in question. The court need not have given all of the five instructions, as they were mainly repetitions of the same rule, but it was harmful error to refuse to give any of them.

The judgments of the circuit court and Appellate Court are reversed and the cause is remanded to the circuit court.    *Reversed and remanded.*

Mr. Justice Magruder, dissenting:

I do not concur in much that is said in this opinion; nor do I agree to the conclusion reached by it. In my judgment the Appellate Court was right in affirming the judgment of the trial court, and gave good reasons for doing so in the following opinion:

"On behalf of appellant it is claimed that there was error, first, in not directing a verdict for appellant; second, in the admission of evidence; and third, in the refusal of instructions asked by appellant, and also in the modification of certain instructions requested by it.

"Under the first point, it is argued that Jennings failed to use the slightest care and caution for his own safety. We think the matter of Jennings' care was a question for the jury, and under the evidence, which is somewhat conflicting, reasonable and fair-minded persons might, acting reasonably, have reached different conclusions, and this being so, the case was properly submitted to the consideration of the jury. *Chicago and Alton Railroad Co.* v. *Kelly*, 80 Ill. App. 675; affirmed, 182 Ill. 267, and cases there cited; *Offutt* v. *World's Columbian Exposition Co.* 175 id. 472; *Pennsylvania Co.* v. *McCaffrey*, 173 id. 169.

"The evidence shows that Jennings, at the time of his death, was sixty-five years of age, and had been in the habit of taking the appellant's suburban trains at its Seventy-sixth street station almost daily for a period of nearly five years, at or about 7:37 A. M., to go to his work, which was that of a glass bender, at Fifty-ninth street and Union avenue, nearer the heart of the city than Seventy-sixth street. In his pocket-book, in the pocket of a suit which he was wearing at the time of the accident, there was found a commutation ten-ride ticket from Auburn Junction to Fifty-ninth street, with one ride unused. This ticket was the one ordinarily used on appellant's railway between Seventy-sixth and Fifty-ninth streets. At Seventy-sixth street appellant's depot

is upon the east side of its tracks, which consist of four main tracks, a spur and two cut-offs, the two easterly tracks being used for passenger trains, the most easterly being for north-bound trains and known as track No. 1, the next to the west being for south-bound trains and known as No. 2, and the two tracks still to the west being for freight trains. Directly east of track No. 1, extending from that track to the depot on the east, is a platform made of two-inch planks on a level with the top of the rails, extending north from the sidewalk crossing about one hundred feet, at the north end being about ten feet wide and at the south end being about seventeen or eighteen feet wide. To the west of the north-bound track, on the same level, and extending from the north-bound to the south-bound track, from the Seventy-sixth street sidewalk, about one hundred feet north, is a similar platform. Substantially the whole crossing of Seventy-sixth street is covered by similar planking on the same level with the platforms, extending across all of appellant's tracks and reaching to the north sidewalk of the crossing, and making a continuous platform or planking between tracks Nos. 1 and 2 from a point about one hundred feet north of Seventy-sixth street to the south line of said street, and a similar continuous platform and planking on the same level east of and immediately contiguous to track No. 1, from a point one hundred feet north of Seventy-sixth street to the south line of the street, with the exception of a narrow space between the south sidewalk and the planking of the street crossing proper between the rails of track No. 1, and also to the east of the east rail of track No. 1. The north sidewalk of Seventy-sixth street joins the east rail of track No. 2, and there is a small space between this sidewalk and the planking of the street crossing extending from the east rail of track No. 2 toward the west. All this planking between tracks Nos. 1 and 2, including the sidewalks on both sides of Seventy-sixth street, was commonly used by per-

sons in the habit of taking or leaving appellant's suburban trains at this point, and Jennings, during all the time he had taken these trains at this station, was in the habit of approaching this platform between the tracks Nos. 1 and 2 from the west on the north sidewalk of Seventy-sixth street, his home being at a point northwesterly from the intersection of Seventy-sixth street and appellant's railroad tracks. He usually and ordinarily took appellant's north-bound suburban train leaving the Seventy-sixth street station at 7:37 A. M., and at the time he was killed was on his way to take this train, going along the north sidewalk, and was struck by appellant's south-bound train either as he stood very near the west rail of the south-bound track or just as he was in the act of stepping across this track on the sidewalk connecting with the platform beyond it to the east. The north-bound train was about on time, but the south-bound train which struck Jennings, as we think a preponderance of the evidence clearly establishes, was several minutes behind time. These trains usually and ordinarily passed each other, when on time, at or about Eighty-first street, which is five blocks to the south of Seventy-sixth street, and several of the witnesses testify that they never knew, although they were familiar with the running of the trains at this point, of this south-bound train passing Seventy-sixth street at the time the north-bound train was stopping there or about to stop there. The north-bound train was scheduled to stop at this station at or about the time that it did actually stop on the morning of the accident, but the south-bound train was not scheduled to stop at this station. Appellant's engineer was an experienced man, had for some time been running this particular south-bound train, and must be presumed to have been familiar with the fact that the north-bound train was scheduled to stop at this station for the receipt and discharge of passengers, and in any event the evidence shows that he saw the north-bound train as he approached

the station from the north, and could easily have seen, if he did not see, that the north-bound train was either stopped at the station or was in the act of stopping. He testified that this north-bound train was not a stranger to him, and he had seen it leaving there as his train would be coming up, sometimes; that he knew perfectly well that this was not the place he commonly passed it; that it stopped at this station for passengers at about 7:37 A. M., as far as he recollected. There were also offered in evidence two rules of the appellant company which were in force at the time, as follows:

" 'Rule 114. Great care must be exercised by trainmen of a train approaching a station where any train is receiving or discharging passengers.

" 'Rule 114a. On double track, opposing trains must not pass while passengers are being received or discharged.'

"The engineer of the south-bound train was no doubt familiar with these rules, though he testifies that he did not remember of being told by one Friedlander that there was a rule prohibiting him from passing a train at a station. He should have been familiar with them. While it does not appear that Jennings was, in fact, familiar with these rules, from the fact that for five years preceding he had been in the habit of riding upon appellant's suburban trains almost daily, it is reasonable to presume that he knew of such a rule, and if he did, he had the right to rely upon its observance by appellant's servants. Moreover, because of his long daily habit of taking this particular north-bound train at this time, it must be presumed that he knew of the fact that the two trains usually and ordinarily passed each other at or about Eighty-first street, which was about half a mile to the south, and it is but reasonable that he should have expected that the south-bound train had already passed at the time he reached the vicinity of the station. It also appears, from the evidence, that as he approached the

station from the west, and as he walked along the side-walk, across the spur, cut-offs and freight tracks, the north-bound train was coming into the station, and at the time that he approached track No. 2, and as he stood very near it, there was considerable noise from the movement of the train and escaping steam, and that he was looking toward this train,—some of the witnesses saying in an easterly, but most of them in a south-easterly, direction. The preponderance of the evidence is that when the north-bound train came to a stop, the rear cars of it, the train being composed of some seven or eight coaches, extended partly across, if not entirely across, Seventy-sixth street. The engine of the south-bound train, as the evidence tends to show, struck Jennings either just as the north-bound train was stopped or about to stop, and we think the clear preponderance of the evidence is that at the time he was struck the engine of the north-bound train and several of the cars had already passed the north sidewalk of Seventy-sixth street. The preponderance of the evidence shows, we think, that the whistle of the south-bound engine was sounded, some of the witnesses saying that it gave several shrill whistles near or north of Seventy-fifth street, in order to warn a colored man who was walking upon the tracks at a point near and south of Seventy-fifth street; and there is also evidence that a shrill blast of the whistle was given,—the engineer says three or four short whistles and then a long one,—as it approached Seventy-sixth street; also, that he first blew the whistle as a warning to Jennings when the train was forty feet or more north of the crossing. All of the witnesses who testified as to the circumstances attending the accident say that they heard the whistle of the south-bound train either north of Seventy-fifth street or as it was near Seventy-sixth street. Most of these witnesses stood either at points on the platform or crossing east of track No. 1, or near the crossing on the west.

"Other circumstances testified to by the various witnesses, bearing upon the question of Jennings' care, appear from the evidence, all of which we have carefully considered, and we cannot say that a finding by the jury, considering all the evidence, that Jennings exercised such care as an ordinarily prudent person would have done under the circumstances shown, can be said to be manifestly against the evidence. Whether he should have looked to the north, under all the circumstances shown, was a question of fact for the jury, as has been repeatedly held by this and the Supreme Court. *Partlow* v. *Illinois Central Railroad Co.* 150 Ill. 321; *Chicago and Northwestern Railroad Co.* v. *Hansen,* 166 id. 623; *Pennsylvania Co.* v. *Frana,* 112 id. 398; *North Chicago Street Railroad Co.* v. *Nelson,* 79 Ill. App. 229; *Chicago and Alton Railroad Co.* v. *Smith,* 180 Ill. 453; *Illinois Central Railroad Co.* v. *Batson,* 81 Ill. App. 142.

"In the *Partlow case, supra,* while the court says that it has been said, in discussing a question of fact, it was the duty of a person approaching a railroad crossing to look and listen before attempting to cross, and that a failure so to do was negligence, it also says: 'The court cannot say, as a matter of law, that the failure to look and listen is negligence. These facts are proper for the consideration of the jury in determining whether a person has been negligent, but it cannot be said, as a matter of law, that a failure to observe such acts is negligence,' —citing cases. The same doctrine is re-affirmed in the *Hansen case, supra,* and the court says: 'It seems to us impossible that there should be a rule of law as to what particular thing a person is bound to do for his protection in the diversity of cases that constantly arise, and the question what a reasonably prudent person would do for his own safety, under the circumstances, must be left to the jury as one of fact.'

"On the matter of the speed of the south-bound train at and immediately preceding the time of the accident

there is a conflict in the evidence, the various witnesses placing the speed at from twenty to forty miles per hour. The engineer says he was running between twenty and twenty-five miles per hour. A brakeman on the same train said that it was running about twenty miles an hour. One of plaintiff's witnesses, who was engaged in the coal business at Seventy-sixth street for six years and entirely familiar with the running of trains, says that it was going about thirty-five miles per hour. Another, Johnson, who lived close by the tracks and was walking upon the south-bound track about half way between Seventy-fifth and Seventy-sixth streets, to warn whom the first shrill whistles were given, said the train was going at thirty-five or forty miles an hour—'she was flying.' Another witness, an advertising agent, familiar with the running of railway trains, says that it was running thirty-five or forty miles an hour; that before it struck Jennings it seemed to be going a little slower, but it was coming very fast. The ordinance which was put in evidence limited the speed of passenger trains at this point to thirty miles per hour.

"From a full consideration of the evidence we can not say that a finding by the jury that the speed of the train between Seventy-fifth and Seventy-sixth streets exceeded thirty miles an hour can be said to be manifestly against the evidence. But if it be conceded that the speed of the train was less than thirty miles per hour, and therefore not in violation of the ordinance, we are of opinion that under the first count of the declaration, which charges that the train was carelessly, negligently and improperly driven, managed and run, the claim of negligence, generally, is established by the evidence. The running of the train at all past the station was a violation of the rule of the company, which required that it should not pass the north-bound train while passengers were being received or discharged. There is evidence that the north-bound train had stopped for the

purpose of receiving and discharging passengers, and that there were numerous passengers upon the platform and at the crossing waiting to take the train. Also, taking the evidence of the engineer that he was running at the rate of twenty to twenty-five miles per hour, that was a negligent rate of speed considering all the circumstances shown, and was in direct violation of the rule of the company which required that 'great care must be exercised by trainmen of a train approaching a station when any train is receiving or discharging passengers.' In the *Kelly case, supra,* it was said, Mr. Justice WRIGHT delivering the opinion of the court, and which was adopted by the Supreme Court, that 'the running of a freight train at a high rate of speed past a station where a passenger train is receiving and discharging passengers is so plainly negligent as not to require comment. It is equally negligent to so run a freight train just as the passenger train is pulling into the station, and more especially when the track on which the freight train is moving is between the depot and the track on which the passenger train is moving.' So we are of opinion in this case that the jury were justified in finding that the appellant was negligent, not only because the train was run at a speed in violation of the city ordinance, but in violation of its own rules, and also in running past the north-bound train at the rate of twenty or twenty-five miles per hour, even if it had not stopped, but was upon the point of stopping, at the station for the purpose of receiving and discharging passengers.

"It is claimed by appellant's counsel that as it is alleged in each count of the declaration that Jennings was received by the appellant as a passenger, and because there was no evidence tending to prove this allegation of the declaration, there could be no recovery. We think the contention is not tenable, for two reasons: First, because the evidence tends to show that Jennings was received as a passenger, and from it the jury were justi-

fied in finding that he was so received; and second, the
proof of the allegation was not necessary to a recovery
in this case.

"From the evidence, partly hereinabove stated, while
it appears that Jennings was not actually upon the plat-
form between tracks Nos. 1 and 2, he was within a few
feet of it, approaching it upon the sidewalk built of the
same kind of material as the platform by the appellant,
which platform was immediately adjoining the sidewalk,
between the tracks, upon the same level therewith, and
the sidewalk was immediately adjoining and connected
with the planking which formed the street crossing, all
of which crossing, including the said sidewalk, was ha-
bitually and commonly used by persons and passengers
who were received and discharged from appellant's sub-
urban trains.  This, with the further fact that Jennings
had for several years prior thereto been almost daily in
the habit of approaching appellant's trains, as well as
leaving them, by this platform, crossing and sidewalk,
and that he had upon his person a commutation ticket
which was good for passage upon appellant's railway
trains, was sufficient proof to support the allegation that
he was received as a passenger by the appellant.  We
think that under these facts it may be said that he was
upon the premises of the carrier,—at least premises which
it had appropriated and used for the purpose of receiving
and discharging its passengers, and for their convenience.

"In 2 Wood's Railway Law, 1037, it is said:  'It is not
always easy to determine when the relation of passenger
begins, and it would seem from the cases that it is not
necessary that a contract for passage should have been
actually made or the fare actually paid in order to create
the relation, but it is necessary that a person should be
under the control of the carrier in order to be entitled to
its care as such.  Therefore, a person cannot be regarded
as a passenger who is not upon the premises of the car-
rier.'  In *Illinois Central Railroad Co.* v. *O'Keefe*, 168 Ill. 115,

190—32

the court, in considering the question as to when the relation of passenger and carrier exists, says: 'One does not become a passenger until he has put himself in charge of the carrier and has been expressly or impliedly received as such by the carrier.' In Cooley on Torts, 770, the author says: 'The responsibility of a carrier begins when the passenger presents himself for transportation; and this he may be said to do when he approaches the place of reception for the purpose.' The following authorities hold, in substance, that this relation commences when a person goes upon the premises of the carrier for the purpose of taking a train, and its premises are considered as any place where it has been allowed a custom to receive passengers, even where there is no platform provided, and that it is necessary only, in order to create the relation, that the person should be upon the premises of the carrier for present transportation and waiting to take the train: *Lent* v. *Railroad Co.* 120 N. Y. 467; *Allender* v. *Railroad Co.* 37 Iowa, 264; *Railroad Co.* v. *Galliher,* 89 Va. 639; Thompson on Carriers, 43; *DeWire* v. *Railroad Co.* 148 Mass. 343; *Pennsylvania Co.* v. *McCaffrey,* 173 Ill. 169.

"As we have seen by the several counts of the declaration, besides the allegation that Jennings was received as a passenger, it is averred that it was the duty of appellant to have allowed Jennings to safely cross the railroad track to safely take and mount the train, and not to have negligently driven its engine and train of cars up to and over the crossing when Jennings was standing or walking over the crossing, with all due care and diligence on his part, for the purpose of reaching and mounting the north-bound train. We think the proof of this allegation was entirely sufficient, so far as concerns the question of care on Jennings' part and the negligence of the appellant, to justify a recovery without any proof that he was received as a passenger. It is elementary that in this class of cases the proof of one charge of negligence is sufficient to justify a recovery, so far as neg-

ligence is concerned, without proving other charges of negligence made by the declaration. If Jennings was received as a passenger, appellant's duty to him was that of the highest care; but if he was not, it still owed him the duty of exercising ordinary care, at least, to avoid injuring him.

"On behalf of appellant it is also claimed that there was error in permitting evidence as to the use made, prior to the accident, of the planking between the north and south-bound tracks in alighting from and taking suburban trains at the Seventy-sixth street station, and also as to the extent of such use. No authority is cited in support of the contention, and we think what has already been said shows that this evidence was entirely proper and admissible.

"The learned trial judge refused thirteen instructions asked for appellant, and modified two others, each of which rulings is claimed to have been erroneous. Five of these instructions, numbered 1 to 5, inclusive, are based upon the theory that it was necessary for appellee to prove, before there could be a recovery, that Jennings had been received as a passenger by appellant. What has been said sufficiently disposes of the claim that it was error to refuse these instructions.

"Two others of these instructions, Nos. 6 and 7, are based upon the theory that it was the duty of Jennings to have looked in each direction for the approach of trains, and in substance tell the jury that there could be no recovery unless he did so look. What has been said we think disposes of this contention, and shows that it was not error for the court to refuse the instructions.

"The ninth refused instruction is in substance covered by the tenth. Instruction No. 11½, refused, is, in our opinion, properly refused, because it singles out and calls to the attention of the jury a particular part of the evidence. We think the twelfth and thirteenth refused instructions were properly refused, the twelfth because

there was evidence that the north-bound train had stopped at the station for the purpose of receiving and discharging passengers, and that it was a violation of the appellant's rule for the south-bound train to pass it under such circumstances. The thirteenth instruction ignores the rule of the company, and was therefore properly refused. The fourteenth instruction was properly refused because, among other things, it tells the jury there was no proof as to whether or not the bell on the engine of the south-bound train or the tower bell was ringing as the south-bound train approached the crossing. The first of appellee's witnesses testified that 'aside from the shrill whistling that occurred before the accident I didn't hear, notice or remember anything else.' From this evidence we think the jury were justified in finding that neither of these bells was rung. The fifteenth instruction was properly refused because it is argumentative, and, besides, it in substance tells the jury that certain facts constitute negligence. (*Illinois Central Railroad Co. v. Griffin,* 184 Ill. 9.) Instructions numbered 10½ and 11 were properly modified. Instruction 10½, as asked, had the same defect, as to Jennings' duty to look up and down the tracks, as in instructions 6 and 7, refused. As modified, this objection was cured. The eleventh instruction was as favorable to appellant, as amended, as it was entitled to have it. We see no objection to the instruction given as it was modified.

"Being of opinion that the jury was sufficiently instructed as to the issues involved, and that there is no error in the record, the judgment is affirmed."

Mr. Justice Carter, also dissenting.