CHICAGO, R. I. & P. RY. CO. v. THURLOW.

(Circuit Court of Appeals, Eighth Circuit. April 27, 1910.)

No. 3,100.

1. CARRIERS (§§ 246, 344*)—CARRIERS OF PASSENGERS—CREATION OF RELATION.
    The relation of carrier and passenger is created only by contract, express or implied, and the presumption is that one riding out of the place provided by a railroad company for passengers is not a passenger, or, if such, that he has assumed the increased risk from riding there.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1284, 1399; Dec. Dig. §§ 246, 344.*]

2. CARRIERS (§ 247*)—CARRIERS OF PASSENGERS—TERMINATION OF RELATION.
    The relation of carrier and passenger between a railroad company and one riding on one of its trains terminates when the passenger has reached the place of his destination and has had reasonable time to alight and leave the company's premises.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 984–993; Dec. Dig. § 247.*
    Continuance of passenger relation, see note to Chesapeake & O. Ry. Co. v. King, 40 C. C. A. 437.]

3. CARRIERS (§ 247*)—RAILROADS (§ 275*)—CARRIERS OF PASSENGERS—TERMINATION OF RELATION—SUBSEQUENT INJURY TO PASSENGER.
    Plaintiff's husband shipped an emigrant car over defendant's railroad, containing household and other goods and horses. The contract provided that he should be transported on the same train for the purpose of caring for the stock and should ride in the caboose. The car reached its destination in the evening and was placed on a passing track. Deceased paid the freight and unloaded his horses into the stockyards, and cared for them for the night, after which he went into the car to sleep without the knowledge of defendant's employés. During the night in some unknown way the car was started, and ran down a grade and upon the main track, where it came into collision with a train, and he was killed. There was a hotel near by, and the car had a padlock with which it could be securely fastened. Held, that he was not a passenger after his horses were unloaded, conceding him to have been one previously, nor had he any right under his contract to occupy the car as a sleeping place, or to enter it except to unload his goods, and that as a trespasser defendant owed him no duty, except not to wantonly injure him, and could not be held liable for his death on the ground of negligence, because a derailing device at the switch, which should have derailed the car and prevented it from going onto the main track, was not in position or failed to operate.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 984–993; Dec. Dig. § 247;* Railroads, Dec. Dig. § 275.*]

In Error to the Circuit Court of the United States for the District of Kansas.

Action by Iola Thurlow against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

Paul E. Walker (M. A. Low, on the brief), for plaintiff in error.
W. P. Hackney (J. T. Lafferty, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and RINER and WM. H. MUNGER, District Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

RINER, District Judge. This was an action brought by the defendant in error, hereafter called the plaintiff, against the plaintiff in error, hereafter called the defendant, to recover damages for the death of her husband, which she alleges in her petition was caused by the negligence of the defendant. The record discloses the following facts:

On February 28, 1908, W. C. Thurlow, the husband of the plaintiff, loaded a car at Oxford, Kan., with household goods, farming implements, wearing apparel, bedding, four horses, and a wagon, for the purpose of shipping them to Calhan, Colo., near which place he had taken up a homestead. The car was hauled from Oxford to Wellington, Kan., by the Atchison, Topeka & Santa Fé Railway Company, and there delivered to the defendant for transportation to Calhan.

The defendant had two rates in force between Wellington and Calhan for shipments of this character. When the higher of the two rates was paid the railway company took full charge of the car and became responsible for its safe and prompt delivery. The lesser of the two rates limited the liability of the defendant, and if accepted by the shipper he was required to sign a contract whereby he was permitted to ride in the caboose attached to the train in which his car was being transported for the purpose of caring for his stock. By the contract he also released the defendant from the duty of caring for the stock and from liability for damages or injury resulting from certain causes therein specified, unless shown to be directly caused by the negligence of the defendant. The contract also contained a release, which the shipper, if he desired to accompany his stock, was required to sign, exempting the defendant from liability for injury to himself while he was accompanying the shipment. These two rates were shown in the tariffs filed with the Interstate Commerce Commission and were open to inspection by the public at the station at Wellington.

It was entirely optional with Thurlow as to which rate he would accept. He chose the lower of the two rates, signed the contract and release, and rode from Wellington, Kan., to Calhan, Colo., on the same train in which his car was transported. The train of which Thurlow's car was a part reached Calhan on the evening of March 3d about 7 o'clock, and his car was placed on what is designated in the record as the "passing track," where the unloading chute for the purpose of unloading live stock was located. After this was done he paid the freight to the agent at Calhan and the car was delivered into his possession. Later in the evening another emigrant car was placed on the passing track, the two were coupled together, and Thurlow's car was placed opposite the unloading chute. Assisted by Munyan, the man in charge of the other car, Thurlow's horses were unloaded and placed in the stockyards and cared for for the night. After that had been done, Munyan and Thurlow released the brakes on Thurlow's car, ran it down the track for a distance of about 200 feet from the unloading chute to a highway crossing, where Thurlow stopped it by setting the brakes. Thereafter, and about 10 o'clock, the night operator, at Munyan's request, assisted in releasing the brakes on Munyan's car and pushing the car to the chute, where his live stock was also unloaded.

After the horses had been unloaded, Munyan and Thurlow built a fire, and prepared and ate their supper. About 12:30 on the morning of the 4th Thurlow went to his car for the purpose of going to bed. Munyan requested Thurlow to go with him to the hotel, where he (Munyan) offered to procure rooms for them. Thurlow refused to do so, although the door of his car was protected by a padlock. The fact that Thurlow intended to, or did, sleep in his car was not known to the agent or any person connected with the defendant. In some manner during the night, though for what reason or how the record does not disclose, Thurlow's car escaped and ran out on the main line, where it collided with a train and Thurlow was killed.

The petition charges that the defendant was negligent in failing to set the brakes on the car when it was left at Calhan, and failing to place the derail provided for that purpose, so that the car could not escape onto the main line, and in failing to capture the car after it had escaped from the passing track and before it collided with the train. The passing track at Calhan, from near the point where Thurlow's car was located, descends rapidly towards the east, and a derail switch was installed for the purpose of protecting trains on the main line, and was so located that, if a car got beyond control while on the passing track, the derail, if in position, would wreck it and turn it down an embankment. The derail switch consisted of a movable bar, which was laid on the top of the rail and placed in position to derail cars. The bar was fastened by means of hinges to three pedestals, which were spiked to the ties between the rails.

At the trial of the case the court withdrew from the consideration of the jury all allegations of negligence, except the allegation respecting the position of the derail switch. The evidence tended to show that when the section crew quit work on the evening of March 3d the derail was in proper condition in every respect, and that when it was last used by any one connected with the defendant it was placed in position so that it would derail cars. Upon examination the morning following the accident it was found that the derail had been turned over and laid between the rails in such a position that the passing track could be used without hindrance. The west pedestal of the derail switch had been broken; but the evidence shows that, notwithstanding that fact, it could be used. The only evidence offered by the plaintiff in respect to the derail switch was a telegram sent by Dickey, the conductor of the train which brought the Munyan car to Calhan, which read as follows:

"Calhan, 3–3, 2–97. Run over derail east end Calhan passing track. Derail is broken, but can be used.                                    Dickey."

The brakeman, one of the members of the crew of this train, testified that after his train left the passing track at Calhan he placed the derail in proper position to derail any car that might become unmanageable. The night operator testified that he cautioned both Munyan and Thurlow to be very careful with their cars while on the passing track, and called their especial attention to the heavy grade and the danger of attempting to move the cars. At the conclusion of the evi-

dence the defendant requested the court to direct a verdict in its favor, which request was overruled, and an exception taken.

The court by its instructions took away from the jury the question whether the deceased was a licensee, on the ground that there was no evidence in the case which tended to show that he was such licensee, or on which recovery could be had if he was a licensee, but instructed that if the jury believed the deceased did not intend to terminate his relation of passenger with the defendant, and defendant did nothing to terminate the contract, and if a reasonably prudent man would have remained in the car during the night, a recovery might be had, unless the deceased did some act which contributed to his death.

The petition did not allege that at the time of the accident the deceased was a passenger. The allegation is that pursuant to a custom and verbal agreement with the defendant the defendant allowed the deceased "to ride in and live in such cars with such property, and look after and care for the same, until such cars arrived at their destination and were emptied of their freight at the terminal of such car's destination, which the said W. C. Thurlow did"; and after alleging the arrival of the car at its destination, and that deceased had unloaded his horses, it is further alleged:

"And in pursuance of said verbal agreement, and according to defendant's said custom of allowing caretakers in charge of such cars, theretofore and then in evidence, and customary as aforesaid, the said W. C. Thurlow remained in said car, intending to stay in said car and care for said property until the same should be placed on the said defendant's side track adjoining its depot the next day."

There was no evidence tending to show a verbal agreement or custom permitting the deceased to remain in the car during its transportation, or after it had reached its destination. No attempt was made to prove a verbal agreement, and the only evidence of a custom was to the effect that prior to that time some of the persons in charge of emigrant cars remained in them overnight. There was no evidence tending to show that they did so with the permission of the defendant, or that it ever at any time recognized in any way their right to do so.

It is well settled by repeated decisions that a person must be expressly or impliedly received as a passenger before a carrier becomes under obligation to exercise towards such person that high degree of care and caution for his safety which is due from a carrier to a passenger. The relation between carrier and passenger is contractual, and is created only by a contract express or implied. In Chicago, Rock Island & Pacific Railway Company v. Lee, 92 Fed. 318, 34 C. C. A. 365, Judge Sanborn said:

"The presumption, in the absence of countervailing evidence, is that one who rides in a baggage car, an express car, a stock car, or on a freight train, is not a passenger on it, and, even if he is, since he is riding out of the place provided by the company for passengers, that he has assumed the increased risk resulting from riding there, and is therefore guilty of contributory negligence. Bryant v. Railway Company, 53 Fed. 997 [4 C. C. A. 146]; Player v. Railway Company, 62 Iowa, 727 [16 N. W. 347]; Jenkins v. Railway Company, 41 Wis. 112: Railway Company v. Miles, 40 Ark. 298 [48 Am. Rep. 10]; Gardner v. Northampton Company, 51 Conn. 143 [50 Am. Rep. 12]; Powers v. Railroad Company, 153 Mass. 188 [26 N. E. 446]; Files v. Railroad Com-

pany, 149 Mass. 204 [21 N. E. 311, 14 Am. St. Rep. 411]; Hoar v. Railroad Company, 70 Me. 65 [35 Am. Rep. 299]."

Although it is not alleged in the petition that the deceased was a passenger, yet the case was tried by the plaintiff on the theory that he was a passenger, and that at the time of the accident the relation of carrier and passenger had not been terminated. Assuming, for the purposes of the case, that the relation of passenger and carrier did exist by virtue of the contract entered into between the deceased and the defendant for his transportation from Wellington to Calhan, and that the defendant had undertaken, as to him, all the duties and obligations of a carrier of passengers, manifestly that relation terminated upon his arrival with his car at his destination and after a reasonable time had elapsed for him to alight and leave the premises of the defendant. Chicago, Rock Island & Pacific Railway Company v. Wood, 104 Fed. 663, 44 C. C. A. 118; Archer v. Union Pacific Railway Company, 110 Mo. App. 349, 85 S. W. 934; Chicago & Eastern Illinois Railroad Company v. Jennings, 190 Ill. 478, 60 N. E. 818, 54 L. R. A. 827; Allerton v. Boston & Maine Railroad Company, 146 Mass. 241, 15 N. E. 621; Legge v. New York, N. H. & H. R. Co., 197 Mass. 88, 83 N. E. 367, 23 L. R. A. (N. S.) 633; Bowen v. Illinois Central Railroad Company, 136 Fed. 306, 69 C. C. A. 444, 70 L. R. A. 915; Chicago, K. & W. R. Co. v. Frazer, 55 Kan. 586, 40 Pac. 923; Payne v. Illinois Central Railroad Company, 155 Fed. 73, 83 C. C. A. 589; Orcutt v. Northern Pacific Railroad Company, 45 Minn. 368, 47 N. W. 1068.

This was certainly true after his horses had been removed from the car and placed in the stockyards for the night. His contract provided for his transportation upon the train for the sole purpose of caring for the live stock, and after the train reached its destination and the live stock had been unloaded, his car being provided with a padlock whereby it could be securely locked, there was no occasion for him to return to the car. The car had been safely transported to its destination, he had paid the freight, and his live stock had been unloaded and placed in the stockyards. After that time he stood in no closer relation to the defendant than an ordinary consignee, who has a car load of freight on a side track at a station. He would have the right to go into the car for the purpose of unloading his freight, and while there for that purpose the defendant would owe him the duty of using reasonable care to see that he was not injured by its negligence or the negligence of its employés. The contract provided that he should remain seated in the caboose attached to the train while the train was in motion, and that he was permitted to go on the train and in his car only for the purpose of caring for the live stock. The removal of the stock from the car took from the deceased his right to protection while in the car, at least until he commenced to remove his freight.

There is no evidence tending to show that he used this car as a place to sleep, or that he rode therein, during the transportation of the car from Wellington to Calhan. The contract provided that he should ride in the caboose, and the only authority he had for being upon the car at any time was for the purpose of taking care of the live stock.

It is not claimed that there was any omission of duty towards the deceased until after he reached his destination, and even if it be conceded that the relation of passenger and carrier continued up to the time his horses were unloaded in the stockyards and cared for for the night, which was between 9 and 10 o'clock, it certainly terminated after that had been done and a reasonable time had elapsed to enable him to leave the defendant's premises. That he had sufficient time to do so is clearly established by the record. The testimony shows that he did not attempt to go to bed on the car until half past 12 on the morning of the 4th; that when he did go into his car to sleep he did so without the knowledge or consent of the defendant or its employés; and in the absence of such knowledge it was but reasonable for the defendant's employés to suppose, after the stock had been cared for, there being a hotel within 300 feet of the station, that he would go to the hotel for the night.

If he remained upon the car without the knowledge of the defendant or its employés, we cannot understand upon what theory it can be held guilty of negligence. If he was a mere trespasser, as we think he was, the defendant owed him no duty except that it should not through wanton or willful negligence injure him, and such negligence cannot be attributed to the defendant unless it or some of its employés knew of his presence upon the car. As we have already suggested, there was no occasion for him to be in or about the car after his horses had been unloaded and cared for for the night. He had been provided with a padlock, and his car could have been securely locked, and his goods fully protected without his presence in the car; nor does his contract of shipment presuppose a necessity for doing so, and therefore confer upon him a corresponding right.

The court instructed the jury as follows:

"Now, gentlemen, if the plaintiff in this case has proven to you by the greater weight of all the credible testimony in the case that after this train arrived at the town of Calhan, taking into consideration the time at which the car arrived there, the time in which it would take a reasonably prudent person to care for the stock in his car, which he was obliged to care for under the contract, properly, and taking all the facts and circumstances in evidence in the case, if you believe the deceased did not intend to terminate his relation of passenger with the defendant company, and defendant did nothing to terminate the contract, and that on account of the manner in which the car was there left, and the obligation imposed upon the deceased to look after and care for his live stock, if a reasonably prudent man would have there remained all the night, as he did, then in that case the relation of the deceased to the railway company as passenger had not been terminated either by himself or defendant. The plaintiff may, if the relation of passenger continued at the time of the accident, recover in this action, unless he did some act that contributed to his death.

"There is evidence here that he, with others, moved this car, that the brakes were unset, and that the brakes were again set. If in any act he did there, unloosening these brakes or in resetting them—not setting them tight, as they should have been—if anything he did there on that night directly contributed toward that car escaping down that track, and colliding with the west-bound train, which resulted in his death, then you cannot find for the plaintiff in this case. And you cannot find for the plaintiff in this case unless you find at the time that this car escaped he occupied the relation of passenger to the railway company. If the railway company carried deceased to the town of Calhan, and the deceased then intended to abandon his relation with

the company, the plaintiff cannot recover in this suit. If, under all the facts and circumstances, taking into consideration the time of arriving there, the place at which the car was left, as to whether it was day or night—taking into consideration all the facts and circumstances in the case, if the deceased did not have a reasonable time after arriving there to leave the train and premises of defendant, and thus sever his relation as passenger with the company, then plaintiff may recover in this action for such injury and damages as she has sustained by reason of his death."

This instruction made the right to recover depend upon whether the relation of passenger and carrier existed at the time of the accident, leaving the question to the jury to be determined as a question of fact. We think, under the plaintiff's evidence, if it stood alone, that the court should have declared as a matter of law that the relation of carrier and passenger had ceased, and that the defendant's request for an instructed verdict in its favor should have been sustained.

In the view we have taken of this case, it becomes unnecessary to discuss other questions urged at the argument and in the briefs of counsel.

The judgment of the Circuit Court must be reversed, with instructions to grant a new trial.