EMMA SPEAKS, Appellant, v. METROPOLITAN STREET RAILWAY CO., KANSAS CITY ELEVATED COMPANY, ROBERT J. DUNHAM & FORD F. HARVEY, Receivers, Respondents.

Kansas City Court of Appeals, May 4, 1914.

1. **NEGLIGENCE: Boarding Moving Car at Elevated Station: No Fault Attributable to Motorman.** Where the same track at an elevated station was used by cars going in the same direction but to different destinations so that only those desiring to board a particular car would attempt to do so, the fact that a person is standing on the platform when a car approached is not sufficient to charge the motorman with notice that such person is intending to or will board the car when no signal or other intimation to that effect is given the motorman and the

Speaks v. Railroad.

car does not stop but proceeds on its way. In such case, after the car has passed the regular stopping point for the discharge of passengers at such station, the motorman has a right to presume that the rear gate of the car is closed according to rule and that he can safely resume the usual speed attained between stations. To require the motorman to know that such person would under such circumstances attempt to board the car, when every intimation was to the contrary, would be requiring superhuman powers of him.

2. ———: ———: ———: **Evidence.** Even if, by an answer to a question containing in its terms the location of the front end of the car with reference to the point at which a person was said to be standing on the platform, a witness appears to say that such person was standing by the side of the track as the front end of the car passed, so that the motorman saw or might have seen him, yet, where all the testimony of such witness shows clearly that the person was not standing at such point as the front end passed, but came upon said platform after the front end had passed the point in question, such answer to said former question will not be treated as being any substantial evidence of such fact.

3. ———: ———: **Contributory Negligence.** Deceased went up a stairway to an elevated street railway station platform, thirty feet above the ground, shortly after midnight and sprang upon the rear step of a moving car that was leaving the platform. The motorman had no means of knowing that he would do so. The attempt to board the car was made within ten feet of a guard rail at the edge of the platform which came to within nine inches of the passing car. On the guard rail was a sign warning persons not to board the car while in motion. The gate to the vestibule of the car was closed or nearly so. Deceased got one foot on the step and the other on the vestibule floor and was holding on to the gate with one hand to the handrail of the car with the other, his body outside of the gate. In this perilous position he fell or was struck and thrown to the pavement below. *Held,* that he was guilty of contributory negligence as matter of law and could not recover. And that aside from the element of contributory negligence there was no showing of negligence on the part of the motorman on which the case rested.

4. ———: ———: ———: **Boarding a Slowly Moving Car.** While it is not negligence as matter of law for an able bodied man to board a slowly moving car, and that question is usually one of mixed law and fact to be determined by the triers of the facts under instructions of the court, yet, this rule applies only in cases where the act is not attended by unusual and extra-

ordinary dangers. It has no application where one boards a moving car upon an elevated platform at midnight within a few feet of the edge where is a guard rail or fence likely to strike and hurl him to the ground.

5. ———: ———: ———: ———: Proximate Cause of Fall. The contention that deceased's negligence was not the proximate cause of the injury because it was the sudden jerking of the car that caused him to fall and not his negligence in boarding it cannot be maintained where all the evidence shows that deceased never at any time attained to a safe position upon or in the car but at all times was in an exceedingly perilous situation which was brought about by his boarding the car under such dangerous circumstances.

6. ———: Relation of Carrier and Passenger: Where Such Status Arises. Even in the case of a street railway there must be circumstances from which can be implied an offer to be carried on the part of the one desiring to become a passenger, and an acceptance on the part of the carrier before the relationship can be said to exist. If these do not appear the relation of carrier and passenger does not arise. The mere fact that one runs toward and jumps upon a moving street car does not create the relation in the absence of any showing of acceptance on the part of the carrier or of an invitation to board the car.

7. ———: ———: Duty Owed to One Not a Passenger. As the deceased did not obtain the status of a passenger, the only duty defendant owed him was to use ordinary care to avoid injuring him after it was discovered, or should have been discovered, that voluntarily and uninvited, he had placed himself in a place of danger.

Appeal from Jackson Circuit Court.—*Hon. Frank G. Johnson*, Judge.

Affirmed.

*Langsdale & Howell* for appellant.

*John H. Lucas and Hogsett & Boyle* for respondents.

TRIMBLE, J.—Plaintiff, as the widow of Orville Speaks, sues for damages sustained by reason of her husband's death which she charges was caused by de-

fendant's negligence. The jury found in favor of one of the defendants and for plaintiff in the sum of $2000 presumably against the other, upon which judgment was rendered against the receivers of both. A motion for new trial was filed which the court sustained on the ground that under the evidence plaintiff was not entitled to recover and that the court erred in not sustaining defendant's demurrer. Plaintiff appealed; and the correctness of the court's ruling is now the question before us.

The husband's fall and death occurred shortly after midnight on September 3, 1911, at the Mulberry Street station on the elevated street railway between Kansas City Mo., and Kansas City, Kansas. The platform and station house is about 30 feet from the ground. It is reached by a stairway leading from the ground to the south side of the station or shelter house, the station platform being on the north side thereof, so that one coming up the stairway must go through the shelter house and through a doorway opening on to the platform and then out upon the platform before reaching the track upon which cars pass and where they stop to let off and take on passengers. At the east end of the platform there was a railing or fence extending from the southeast corner of the station house to the track and approaching so closely and at right angles to it that a passing car comes within eight or nine inches of the end of the fence. From the door of the station to this guardrail or fence nearest the track is 16 feet and 10 inches. On this fence was a sign bearing these words in letters three inches high: ''WARNING. DO NOT ATTEMPT TO BOARD CAR WHILE IN MOTION.''

The car which deceased attempted to board was 44 feet long and the station patform 49 feet in length. The car was, therefore, almost long enough to occupy the entire length of the platform when fully on it with its front end even with the guardrail or fence at the

east end. And this was its proper and usual place to let off and take on passengers at that station. Different cars bound for different points and sections of the city ran over this track and passed this station, so that persons on the patform would not board a car at that point unless it was the particular car they wanted. The car which deceased attempted to board, and from which he fell and was killed, was an east bound car.

Deceased, in company with his two brothers, came up the stairway in single file to the station house. Deceased was in front and went through the station house out on to the platform. His brother, Arthur, was a step or a step-and-a-half behind him and the other brother, William, a similar distance behind Arthur.

At the rear end of the car was a step from which a boarding passenger could reach the rear platform or vestibule and from thence pass on into the car proper. At the edge of the rear platform or vestibule was a gate made of iron net work movable on its joints so that it could be opened by pushing it together to one side or could be closed by stretching it across the opening and fastening it there thus forming a fence or barrier to an entrance upon the platform or vestibule of the car.

It is undisputed that plaintiff's husband got upon the step of the car while it was moving and shortly before the rear vestibule or car platform had passed the fence or guardrail at the east end of the station platform, and that just after the rear vestibule of the car passed this fence or guardrail, he fell thirty feet to the ground below and was instantly killed.

There were three specifications of negligence in the petition. The first two of which charged the conductor of the car with negligence. These, however, could not be relied upon as the testimony of plaintiff's own witnesses did not support either of them and the court very properly instructed the jury that no negligence of the conductor had been shown. The conductor could

not be guilty of negligence in ordering the car to start, since all the testimony shows the car was in motion and leaving the station platform before plaintiff's husband attempted to board it by getting upon the rear step of the car.

The third and remaining specification of negligence was against the motorman, charging him with starting the car forward *suddenly* thereby causing plaintiff's husband to lose his balance on the step or runboard of the car and fall to the pavement below. And, since it was admitted that the car was in motion and at least three fourths of the car had passed beyond the east edge of the elevated station platform at the time deceased stepped upon the runboard, the sudden starting of the car complained of was not its initial starting but was a starting up of the car from a slow to a more rapid movement, and made at a time when the rear end of the car was at or near the guardrail or fence at the edge of the station platform, that is, while the car was moving away from and had almost left the station platform, at which time the motorman had a right to presume that the gate to the rear vestibule of said car was closed, according to rule, and that no one would attempt at that perilous place to get upon the car while in motion in violation of the rule of the company and the warning not to do so, conspicuously posted on the guardrail. A sudden acceleration of the speed of the car at that time would not be negligence on the part of the motorman unless he knew or had reason to believe that a passenger had attempted to board, or was in the act of boarding, a car at that point and under those dangerous circumstances, and had not yet had time to get safely inside of the car.

We have examined the evidence offered in plaintiff's behalf carefully to see if there is any substantial evidence tending to show, or from which an inference could be drawn, that the motorman knew or had reason

to believe those facts, and we must hold that there is none.

It must be borne in mind that the motorman was on the front or east end of the car wholly unable to see plaintiff's husband at the time he got upon the rear step of the car. Even if plaintiff's husband standing by the track on the station platform as the front end of the car, containing the motorman, passed the station house door so that the motorman saw or might have seen him, yet, as it is conceded that the track was used by cars going in the same direction but bound for different destinations, and as it is further conceded that deceased did not signal the motorman or give him any intimation that he desired to board that particular car, and as plaintiff's witnesses say the car did not stop at the station, therefore the motorman would have a right to proceed and also to presume the rear gate was closed according to rule. It would be requiring superhuman powers of the motorman to charge him with the duty of knowing that deceased would attempt to board the car at such a place and under such dangerous circumstances when every intimation to the motorman was to the contrary. And unless the motorman had reason to believe that deceased would and did board the car and must therefore have a reasonable time to get safely upon it before the speed of the car could be accelerated, it was not negligence for him to resume the ordinary speed of his car usual between stations. But a careful examination of all the testimony offered in behalf of plaintiff convinces us that there is no substantial evidence tending to show, or from which an infenence could be drawn, that the motorman either saw or might have seen deceased on the patform as the motorman passed. It is true, in answer to a request made to the witness Arthur Speaks to indicate on a photograph of the station patform ''just about where your brother Orville was standing when the front end of the car passed?'' the witness indicated a point about

even with the east edge of the station house doorway.
And to a lengthy similar question asked of William
Speaks, he said Orville was, he judged, about even
with the doorway. Even if these answers be accepted
at their fullest value, they do not show that the motor-
man saw or should have seen him. The car, according
to their testimony, was moving and did not stop. It
was the motorman's duty to look to the front and take
in what would reasonably come within the range of his
vision on either side of the track, but this did not re-
quire him to keep a lookout directly at right angles to
the side of the car under the circumstances we have
above detailed. But however this may be, the entire
evidence of the two brothers shows beyond question
that Orville was not standing by the track when the
motorman passed the door.

Arthur Speaks testified that the car pulled into
the station just as the three brothers reached the top
of the stairway; that Orville was in front a step or
two or a step-and-a-half ahead of him and he about that
distance ahead of his brother. The car was 44 feet
long and the station platform 49 feet. The doorway
from the station house was slightly nearer to the east
end of the station platform than to the west end, it
being 16 feet from the doorway to the guardrail at the
the east edge of said platform. Arthur Speaks further
testified that the car never stopped but was going slow
"just barely moving a man could walk slow and catch
it." He then testified that as Orville came out of the
doorway of the station the *back* end of the car was
about even with the door; that as Orville came out of
the door he had to go in a north-east direction to catch
the car and move fast enough to overtake it. This
being true, Orville was not "standing" by the side of
the track as the front end of the car passed him. After-
wards, when reminded that he had said the *rear* end of
the car was about even with the doorway as his brother
came out, he said that he had misunderstood the ques-

tion, and that when Orville came out of the doorway the rear end of the car was "a little west of him." Even with this correction this did not. show or support an inference that the motorman saw or could have seen Orville, because the point indicated by Arthur as the position of his brother on the platform was slightly east of or even with the east edge of the doorway, and with the car 44 feet long and the rear end only a little west of Orville, it would still put the motorman where he could not have seen or would not be required to see Orville as he came from the doorway. And it is difficult to perceive what it was that the witness failed to understand when he testified that the rear end of the car was about even with the doorway as Orville came out, because on this point his testimony was as follows:

Q. "So his (Orville's) direction from the doorway would be about north-east? A. Yes, .sir.

Q. Now in moving towards the car to jump on the steps—I'll say step on the steps, he would have to move in that direction to do that? A. Yes.

Q. The car was moving as he moved along in that northeasterly direction—the car kept moving at the same time? A. Yes.

Q. And he had to move fast enough to overtake the car? A. Yes, sir.

Q. When he came out of the doorway of the station where was the back end of the car? A. Well—

Q. Well, which way was it? About where was it from the door? A. At the time that he came out of the door?

Q. Yes, sir. A. It was about even with him.

Q. The door of the car was about even with the door of the station? A. *Yes, sir. The back end of the car was about even with the door.*"

If the car was going as slowly as Arthur Speaks said it was, and the front end of the car passed Orville while he was standing on the platform at a point even

with the east edge of the door, why was it necessary for Orville to go in a northeast direction to catch the car, since he could have stepped on the rear steps as it passed him? The witness said at one place that the back end of the car was five or six feet east of the doorway at the time Orville got upon the step. This made him get on at a point much nearer the guardrail at the east edge of the station platorm and within ten or eleven feet thereof. And yet at another place the wit- ness says that the car started up suddenly "just as fast as a car can when the current is all on" right at the point where, and moment when, Orville got on, and then further on the witness says the car made this sudden increase of speed when the rear end was about two or three feet inside of the guardrail. According to this, therefore, the deceased boarded, or attempted to board, the car at about the place where defendants' witnesses said he did, namely, a few feet inside the guardrail and just before the rear vestibule of the car left the station platform. And to reach the point where he attempted to board the car he went from the door- way in a northeast direction. All of which shows that the motorman could not have seen deceased, and could not have had any reason to believe that he would board the car.

Plaintiff's only other witness as to what took place on the platform was the other brother William. His testimony is that he was just going through the door at the top of the stairs on the opposite side of the station house from the station platform when the rear end of the car was about even with the doorway of the station house; that he was in the station doorway in the act of coming out on the patform when his brother Orville stepped on the rear car step; that Orville did so at a point not over four or five feet from the guard- rail and that the car was in motion. This tends to cor- roborate the version of defendants' witnesses as to what took place on the platform and shows that the

motorman could not have seen or anticipated that
Orville would attempt to board the car.

Plaintiff's other witness was a negro woman stand-
ing on the street below who claims to have seen the man
fall; that he was standing "Like as if he was in the
door of the car"; that the car gave a jerk and he fell
backwards to the street. She said she had noticed how
cars increased their speed and felt them jerk as they
did so but could not say whether the jerk this car gave
was anything unusual or not. She did not testify to
anything occurring on the platform.

Under this state of the evidence there was no
proof that the motorman was or should have been cog-
nizant of the fact that Orville Speaks had attempted or
would attempt to board the car, and hence there was no
negligence on the part of the motorman shown. No
one says the motorman saw him or that any sign was
given to indicate an intention to board the car. And
while in answer to a lengthy question in which the front
end of the car is placed as passing the doorway, the
brothers locate the deceased as standing about even
with the doorway, yet their entire testimony shows that
he was not standing there when the front end of the
car passed, and the answer to each of said two ques-
tions cannot be taken as any substantial evidence of
that fact. [Oglesby v. Mo. Pacific, 177 Mo. 272, l. c. 296;
Brosius v. Sunflower Lead and Zinc Co., 149 Mo. App.
181, l. c. 187.]

The substance and effect of plaintiff's testimony
is to confirm the evidence given by defendants' wit-
nesses as to what took place on the platform. Defen-
dants' witnesses consisted of the motorman, the con-
ductor, two persons on the station platform at the
time, a young lady and gentleman waiting for a differ-
ent car, and two men who were passengers on the car.
Of the six who testified for the defendant as to what

179 App. 21

happened, four had no connection with either side and were therefore disinterested. According to the testimony given by defendants' witnesses, the car came into the station and stopped at its regular stopping place. This put the front end of the car about even with the guardrail at the east edge of the station platform, and the rear end of the car in about five feet of the west end of the station platform. The door of the station house opening on the platform was not quite in the middle thereof, that is, it was about eight feet nearer to the east end than to the west end of said platform. Defendants' testimony further showed that at the time the car stopped, there was no one on the platform except the young lady and gentleman at one side thereof who made no effort or move to board the car; that the gate on the rear vestibule was shut and no one attempted to get off the car; that after the car started up, and as the rear end of the car was passing the doorway of the station house, the deceased came out of the doorway and ran after the moving car "catacornered" across the platform and jumped on the rear step; that the conductor called to him not to get on but when he did get on the step, the conductor realizing his dangerous situation hurriedly attempted to open the gate and reached out to help the deceased into the vestibule, but before the conductor could reach him, the deceased's body struck the guardrail a slight blow and he fell to the pavement below; that he fell from the car at a point three or four feet east of or outside the guardrail. Of the foregoing, the motorman testified only that the car stopped at its regular and proper place; that there were only the young lady and her escort the young man on the platform as the car reached it; that he never saw deceased but could have seen him had he been there; and that he did not know that deceased came out and attempted to get on the car. Of course, in determining whether there was any evidence upon which plaintiff could base a recovery, regard must be

had only to the evidence in plaintiff's behalf, but the evidence of defendants' witnesses may be considered in order to determine whether it does not help out plaintiff's testimony. In this case it does not, and it is only important in the light of the fact that the effect of plaintiff's evidence is to confirm that of defendant's.

Under the testimony there was no showing of negligence on the part of the motorman. The evidence also fell short of establishing the relation of passenger and carrier. Even in the case of a street railway there must be circumstances from which can be implied an offer to be carried on the part of the one desiring to become a passenger and an acceptance on the part of the carrier. [Mathews v. Metropolitan St. Ry., 156 Mo. App. 715, l. c. 723; Stager v. Railroad, 119 Pa. St. 70; Schepers v. Union Depot Ry. Co., 126 Mo. 665, l. c. 672; Schaefer v. St. Louis & Suburban Ry. Co., 128 Mo. 64.] The mere fact that deceased ran or went toward and jumped or stepped on the moving car did not create the relation of carrier and passenger. [1 Nellis on Street Railways (2 Ed.) Secs. 249 and 258.] There was no evidence anywhere that there was any act indicating an acceptance of deceased as passenger. The petition itself states that the defendant company's rule was that the gate should be kept closed while the cars were in motion and to open the gate only when the cars were still. And it also had a rule forbidding passengers from boarding the car while in motion, and that the warning not to do so was painted in large letters on a sign at the very point where deceased attempted to board the car. It was not necessary to bring home to the deceased actual knowledge of the rule if the rule is so conspicuously posted as to lead to the reasonable inference that notice was given of its existence. [1 Nellis on Street Railways (2 Ed.) Sec. 291.] The brothers also testified that deceased had ridden to and from his work over this line for six years, and he was undoubtedly familiar with the elevated platform

and railway. There is, therefore, nothing in the testimony tending to show an invitation on the part of the company to deceased to board the car, and no waiver of the rule against boarding it while in motion, consequently the relation of passenger and carrier did not come into existence. The case is wholly unlike that of Nolan v. Metropolitan St. Ry. Co., 250 Mo. 602, because in that case the person intending to become a passenger signalled to the motorman and the latter replied with a nod and slackened speed, all of which was absent in the case at bar. Nor is it within the rule announced in Spencer v. Transit Co., 111 Mo App. 653, since there was no signal to stop, and paintiff's husband was bound to know that the motorman was not slowing down to stop, since, at the time he got on, even the plaintiff's testimony is to the effect that at least three-fourth's of the car had left the platform, and was beyond the guardrail at the edge. As the deceased did not obtain the status of a passenger, the only duty defendant owed him was to use ordinary care to avoid injuring him after it was discovered or should have been discovered, that voluntarily and uninvited he had placed himself in a place of danger. [Mathews v. Railway, supra.] But no failure in this respect was pleaded or shown.

In addition to all this the deceased was clearly guilty of contributory negligence as matter of law. According to plaintiff's own evidence, it was past midnight. The car was in motion and leaving an elevated station platform and three-fourths of the car was off of it. The gate of the rear vestibule was either closed or two-thirds closed. Arthur Speaks said the gate was not entirely shut and at first said it was two-thirds shut and then afterwards it was two-thirds or one-third open, "or something like that I couldn't say exactly," and that he didn't know when it was opened. The deceased got on the step under these circumstances at the farthest only ten feet from a fence or guardrail running

up to the track and on which was a huge sign warning him of the danger. William Speaks says the deceased was not over four or five feet from the guardrail when he got on. If an attempt to board a moving car under these circumstances will not constitute contributory negligence as a matter of law, then it would be difficult to conceive of one where it would. It is true it is not negligence *per se* for an able-bodied man to board a slowly moving car, and the question is one of mixed law and fact to be determined by the triers of the facts under proper instructions from the court. But as said in the Mathews case page 724, "this rule applies only in cases where the act is not attended by unusual and extraordinary dangers." In Joyce v. Railroad, 219 Mo. 1. c. 374, under circumstances almost identical with these at bar, the Supreme Court held that if a person undertook to board a car after it started to leave an elevated platform and was struck and thrown down by a guardrail at the edge thereof, he could not recover.

But plaintiff says his attempt to get upon the car did not cause him to fall; that only the sudden starting up of the car caused that, and consequently his contributory negligence, if any, had nothing to do with his fall. The trouble with this contention is that according to all the evidence deceased never was safely on the car. Even plaintiff's evidence shows he only had one foot on the step and the other on the vestibule floor and was outside the partly closed vestibule gate holding to it with one hand and to the rear handhold of the car with the other. He was therefore in a position of great peril, and instead of his contributory negligence in getting on the car having nothing to do with his fall, it had everything to do with it, and was the proximate cause thereof.

Viewing the case from every possible angle and in the light of the testimony most favorable to plaintiff, and giving it the benefit of every intendment and infer-

ence which it will reasonably support, it clearly appears that the plaintiff had no case and the trial court was correct in holding that the demurrer to the evidence should have been sustained. The judgment is, therefore, affirmed. All concur.