SARAH STRONG JONES, Respondent, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Appellant.

1. NEGLIGENCE — RAILROADS — PASSENGER ENTERING CAR AWAY FROM STATION. A railroad company owes no special duty to an embarking passenger to prevent an empty passenger car, standing at a point other than the station platform, from being jolted in making up a train of freight cars to which it was attached, when the passenger has not been personally invited to get on the car at that point by any of the company's representatives, and it does not appear that any person in control of the train knew that the passenger was attempting to get on.

2. PASSENGER CAR STANDING AWAY FROM STATION — OBLIGATION TO TRAVELING PUBLIC. A railroad company is under no obligation to the traveling public to prevent any jolting of an empty passenger car, in making up and attaching freight cars, when the passenger car, being the only one in a mixed local train, is standing at a point other than the station platform, in the absence of actual invitation to board it there, unless it is shown that by long and open user on the part of the public, with the knowledge and acquiescence of the company's representatives, an implied invitation had been extended to the general public to board the car at that point.

3. Making up Freight Train — Jolting Passenger Car. It is not of itself negligence for the engineer, in making up a freight train with an empty passenger car attached, at a point other than that where passengers were invited to board it, to shunt the cars together with such force as to jolt all the cars in the train.

4. Custom of Boarding Passenger Car away from Station. A custom of boarding the passenger car of a mixed train when standing at a point other than the station platform, which will warrant the inference of an invitation to the public to board it at that point, is not established by testimony that in a single instance it had been boarded there without special invitation, even if the act was witnessed by the conductor; that in one other instance the station baggageman had invited a passenger to board the car there, and that in a few instances, but apparently without direction, authority or consent, persons had boarded the car there, although the train always came to the passenger station after being made up, when there were any passengers to be taken.

5. Regulation for Boarding Trains at Station not Extended to Additional Point. Evidence of a few trespasses upon the well-understood regulation of all railroad companies that passengers shall board trains at stations only, committed by boarding a car at some other point than the station without direction, authority or consent, cannot support a finding that the company had invited the public to get on the train at that point, as well as at the station.

*Jones* v. *N. Y. C. & H. R. R. R. Co.*, 90 Hun, 605, reversed. ·

(Argued May 12, 1898; decided June 7, 1898.)

Appeal from a judgment of the late General Term of the Supreme Court in the fifth judicial department, entered October 21, 1895, affirming a judgment in favor of plaintiff entered upon a verdict, and an order denying a motion for a new trial.

This was an action to recover damages for personal injuries alleged to have been caused by the negligence of defendant.

The facts, so far as material, are stated in the opinion.

*Hamilton Harris* for appellant. The defendant was free from negligence contributing to the injury. (*Miles* v. *King*, 18 App. Div. 41; *Black* v. *Third Ave. R. R. Co.*, 2 App. Div. 387; *Jonas* v. *L. I. R. R. Co.*, 21 Misc. Rep. 306; *Walsh* v. *F. R. R. Co.*, 145 N. Y. 301.)

*Elbridge L. Adams* for respondent. There was evidence tending to show that the defendant was negligent, which was

properly submitted to the jury. (*Edgerton* v. *N. Y. & H. R. R. Co.*, 39 N. Y. 227; *Keating* v. *N. Y. C. & H. R. R. R. Co.*, 49 N. Y. 673; *Daley* v. *Port Jervis, M. & N. Y. R. R. Co.*, 80 Hun, 174; *Newton* v. *Central Vermont R. R. Co.*, 80 Hun, 491; *Bartholomew* v. *N. Y. C. & H. R. R. R. Co.*, 102 N. Y. 716; *Hickenbottom* v. *D., L. & W. R. R. Co.*, 122 N. Y. 91; *Distler* v. *L. I. R. R. Co.*, 151 N. Y. 424, 430; *Chicago R. Co.* v. *Arnol*, 144 Ill. 261; Thompson's Carriers of Passengers, 234, § 20; S. & R. on Neg. [4th ed.] § 508.)

Parker, Ch. J.  The judgment awards to the plaintiff $5,000, for injuries sustained by her in a fall, occasioned by the sudden jolt of defendant's car while she was entering it. The story of the accident was told by the plaintiff, and from it we extract the following:

"On the 9th of February, last year (1894), I left my home in Fairport, intending to make a visit. I left my house about half-past eight in the morning, intending to take the West Shore local train for Pittsford. That train was due to leave Fairport a little after nine o'clock or about nine o'clock. I went to the station of the West Shore. I think that is also the depot of the New York Central at Fairport. It is the only station there. It is east of Main street on the north side of the track. There are three or four tracks south of it. When I got to the station I went into the ladies' waiting room. I went up to the ticket agent at the ticket office and asked him how long before that train was due. I spoke of the West Shore local train. He said it was due about eleven o'clock. The ladies' waiting room is on the west side of the station, and the baggage room is at the right or still west of that. As I came out the door I saw Mr. Johnson, the baggage master of the railroad. He wears a uniform. I know him, and had seen him there before. I asked him if that train was the West Shore local for Pittsford, and he said it was. He wanted to know if I wanted to take the train. I told him I did. He then signalled in this way, as I supposed, I don't know who, I suppose to the engineer. He simply

raised his hand and said, 'Take on this lady;' then, after I started, I said, 'I guess I will go right on and get on while the train is still, before the engine gets on,' and I started to go east. Mr. Johnson went off the steps before I did. He walked along out near the platform to the east, and I walked right on the platform until I came near the east end of it, and then I went off and went in the path. We were nearly along together. Then he crossed over when he got to the end of the platform. I continued east to take the train on the northeast side east of the track down as far as the caboose, way down to the end of the train. It was down to very near the first crossing. I couldn't tell you how far it is; the crossing is a drive. I don't believe I know how far that is. When I got down opposite the caboose I crossed over to take the car; I crossed two tracks; I don't know whether I crossed any more or not. When I got to the caboose I went up the steps the same as I always go into a car. I took the outside railing of the car as I went up. * * * And as I went to put my left hand onto the knob of the door to go in, I was * * * the next I knew after that. The next I knew after that I was thrown right backward, sudden jolt, and I found myself right on my back with my head * * * something hit my head right there."

A recovery was had at the Circuit and sustained at the General Term upon the ground that the plaintiff's injuries were due to the fault of the defendant. The particular wrong of which the defendant was held to be guilty is that in switching certain cars for the purpose of coupling them, it brought them so sharply together as to jolt the other cars on the train, including the one passenger car which this plaintiff was at the time entering. If the passenger car had been alongside of the station platform, where people are invited by railroad companies to enter their cars, there could be no doubt that the judgment would be well grounded.

When a passenger car is drawn up to the platform of a railroad station, the act of itself constitutes an invitation to enter it, extended to those desiring to become passengers therein,

and the invitation necessarily carries with it an assurance that the passenger may safely enter without fear that there will be any sudden jerk or jolt of the car. But, as has already been observed in reading the testimony of the plaintiff, she did not enter the car at the station; it was standing some 525 feet from the station at the time she climbed on board of it. The train was what was known as a mixed freight and passenger. It consisted of one passenger car on the rear, and such number of freight cars as the local business from time to time demanded. On this particular day, when the train came into Fairport station, and passed on beyond the depot for the purpose of doing the necessary switching, it consisted of the ordinary passenger coach and fourteen freight cars. Seven of the cars were taken out of the train at Fairport and left there, and a car which was on one of the side tracks was attached to the train, so that when it left that station for Pittsford the train had six cars less than it had upon its arrival. This necessary switching was being done at the time the plaintiff attempted to board the train, to do which she had left the platform and passed down the track several hundred feet. "When (as she testified) I got down opposite the caboose, I crossed over to take the car. I crossed two tracks; I don't know whether I crossed any more or not." There were neither steps nor platform of any kind at this point upon which the plaintiff could stand while trying to reach the steps of the car, nor was there present a conductor, brakeman or other person connected with the defendant to invite or assist her to enter the car. The car itself was empty. The plaintiff knew that the engine was detached from the train, and would have to be put on again before the train could move. This fact appears from the testimony which we have quoted, where the witness says that she said to another person: "I guess I will go right on and get on while the train is still, before the engine gets on." To the situation thus briefly, but with sufficient accuracy, presented, we must apply such legal principles as it demands. And the first inquiry is, did the defendant owe to the traveling public the duty of preventing this car from being jolted at the place

where it was when the plaintiff boarded it? No special duty was owed to this plaintiff, for she was not personally invited to get on the car at this point by any of the defendant's officers or employees; it does not appear that the engineer, or any person in control of the train, knew that she was attempting to get on, and these facts justify the assertion made that the defendant owed no special duty to the plaintiff.

The further inquiry then is whether the defendant was under any obligation to the traveling public, of which the plaintiff forms a part, to prevent any jolting of the car at this point while making up the train. It is obvious that the answer to that question will be furnished by the evidence which discloses whether or not, by long and open user on the part of the public, with the knowledge and acquiescence of the representatives of the defendant, an invitation had been extended to the general public to board the car at this place. For certainly it will not be contended that, in making up a freight train with an empty passenger car attached, the engineer may not shunt the cars together with sufficient force to jolt every other car in the train. That this is so, was well recognized by the learned justice who presided at the trial, who with clearness pointed out to the jury the right of the defendant to make up its train in its own way at any other point than one where passengers were invited to board it, and he left it to the jury to say whether, under the evidence presented, the custom was established on the part of the defendant of taking passengers on this freight train at this point. The jury found that such a custom was established, and if there is evidence to support the finding, the judgment must stand, unless some other error shall call for reversal.

It seems to us that there is no evidence to support such a finding. There was at Fairport a regular passenger station to which this train always came after being made up, when there were any passengers to be taken. On this day as usual, and after the accident had happened to the plaintiff, it pulled up to the depot and two passengers got on. Three witnesses in all gave testimony upon which the plaintiff relied to prove

her claim that the custom had been established of receiving passengers for this particular train at the place of the accident. One of the witnesses, Jacob Morrell, testified : " I live at Fairport. I know the train known as the West Shore local that leaves Fairport in the morning about nine o'clock, going west to Pittsford. I took it the third day of July, 1893. My wife and children were with me. I was going to Pittsford. I took the train just below the station. I should think five or six rods below. I went down and got into the caboose at the end of the train. Q. Who told you to? A. I don't remember as any one. * * * I didn't ask anybody where I was to take that train. The train was standing there and I got on. * * * The conductor was in the car. I don't remember seeing the brakeman."

This isolated instance does not even tend to prove custom. No one connected with the defendant as an officer or employee invited him to get on the train at that point. It is not altogether certain that the conductor saw him get on, but assuming that he did, what could the conductor do about it? He was without authority to put this passenger and his family off the train, or do any other act calculated to serve as punishment to them for failure to obey the well-understood rule of steam railroad corporations — that passengers shall board their trains at stations and not elsewhere. The plaintiff's son testified that he had been to Pittsford by the West Shore train. " Q. Where did you take the train? A. Down, it was a little way beyond that little house there. East of the depot. Q. The first time you went did you have anything to say to Johnson, the baggageman, or he to you about taking the train? A. No, sir; only he told me to go down there and get on. Down to the caboose. It was east of the depot, a little ways beyond that house there. I don't know what that house is. Some railroad house on the north side of the track. I did go down there and get on. The conductor or the brakeman was down on the steps there to the platform. He

helped me on. I don't remember whether he had a uniform on, he looked like a railroad man."

Here we have one instance where it is pretended an employee of the defendant invited a passenger to board the train at some other point than the depot platform, and it furnishes the only evidence we have in this record of either invitation or consent on the part of the employees to the boarding of a train by passengers at any other point than the station.

The third witness, John D. Maloney, formerly a flagman of the defendant, testified that the train was a freight train with a passenger coach at the end of it, with some shifting generally to do at Fairport, where the train usually remained ten or fifteen minutes. "I have seen passengers take that train below the station and at the station. I have seen them take it perhaps two hundred yards below the station. They would go down and get into the caboose while the engine was off shifting. Times when passengers would be at the station when I suppose the engineer would be notified, and he would stop there. Days I have seen four or five people go down east and take this train and days less. I suppose the conductor's orders are, before the train goes out, to go into the station and inquire whether there is anybody to get on the train, whether any person has bought tickets. I think that has been done. If there are passengers to get on, the train stops at the station; if there are no passengers to get on, it goes on." Not a word in the testimony of this witness tends to show that any one of the persons whom he saw boarding this car below the station, did so at the invitation of any of the defendant's officers or employees. He testified that there were days when he had seen four or five people go down and take the train at this point, but he did not say how often it occurred; probably it was not very often, for it is made quite clear by the testimony that there were days when there were no passengers whatever at this station. In all of this record then we have the testimony of one witness that he was told by the baggageman to go down east and get on the train

while the engine was switching.   Not another act on the part of a railroad employee of any grade tending to encourage the public, or any portion of it, in boarding the train at this point. Nothing to show that any employee of the defendant, save the flagman Maloney, ever saw passengers boarding the train except at the station, or that such employee consented to their boarding the train elsewhere.   It is not at all likely that the defendant, or its employees, would encourage such conduct as would require the maintenance of two stations within about five hundred feet of each other for the boarding of a single car, which many days was without passengers from the village of Fairport.   We have, it is true, evidence that some people boarded the train at this point, but they boarded it apparently without direction, authority or consent; and this trespass upon the well-understood regulations of all railroad companies that passengers shall board trains at railway stations only, cannot support a finding that the defendant had invited the public to get on the train at this point, as well as at the station.   The safety of the traveling public has made it necessary to apply to common carriers, especially in respect to vehicles propelled by steam, far more stringent rules than govern many other relations that exist among men; but neither the public interest nor good morals would be subserved by permitting evidence of a few trespasses to establish a right in the public, and to impose a duty upon the railroad to be watchful lest future trespassers should come to harm.

Reaching the conclusion that there was no negligence on the part of the defendant in this case, we omit a discussion of the other questions presented by the appellant.

The judgment should be reversed and a new trial granted, with costs to abide the event.

Bartlett, J. (dissenting).   I am unable to vote for the reversal of this judgment.

The questions of plaintiff's contributory negligence and defendant's negligence were involved in a conflict of evidence and properly submitted to the jury.

It was for the jury to determine whether, by reason of the usual course of business, there was an implied assent on the part of defendant that passengers might board the freight caboose a considerable distance east of the passenger station platform. This being established, it was for the jury to further decide whether due care was observed by defendant in coupling cars at the time plaintiff sought to board the train.

While this is a close case, there were three witnesses besides the plaintiff, who gave evidence tending to establish a general course of business and assent, either express or implied on the part of defendant, that passengers might enter the train at or about the point where the plaintiff did at the time of the accident.

I am of the opinion that the judgment should be affirmed.

GRAY, HAIGHT and MARTIN, JJ., concur with PARKER, Ch. J., for reversal; O'BRIEN and VANN, JJ., concur with BARTLETT, J., for affirmance.

Judgment reversed, etc.