Argued March 13, affirmed April 9, 1918.

# PALMER v. WILLAMETTE VAL. S. RY. CO.*

### (171 Pac. 1169.)

**Carriers—Passengers—"Intending Passenger."**

1.   A person places himself in the position of an intending passenger when he goes upon the carrier's premises with the *bona fide* intention of becoming a passenger, and awaits the train at a proper place, in a proper manner, within a reasonable time before the arrival of such train.

> [As to who are passengers and when they become such, see note in 61 Am. St. Rep. 75.]

**Carriers—Passengers—Duties.**

2.   Among the duties owing from the carrier to intending passengers is the duty to stop all trains, scheduled to stop, at designated places.

**Carriers—Passengers—Entering Train.**

3.   Where a carrier has stopped its train at a regular station, it is incumbent upon it to keep the cars standing for such time as was reasonably necessary to enable intending passengers, acting with reasonable diligence, to board the train, but the carrier need not wait for any belated person.

**Carriers—Passengers—Entering Train.**

4.   While waiting at the depot a standing train serves as an invitation to all intending passengers to board it, and the invitation carries with it an assurance that the passenger may board the train in safety, but starting the train ordinarily operates as a withdrawal of the invitation.

**Carriers—Passengers—Leaving Grounds.**

5.   It is not the rule that once a passenger always a passenger, but a passenger who leaves the carrier's grounds, even temporarily, loses his status as such.

**Carriers—Passengers—Leaving Grounds.**

6.   Where an intending passenger, having reached the station, left it to talk to a person on a county road near by, his status as an intending passenger was at least suspended.

**Carriers—Stopping Trains—Unusual Stops.**

7.   The mere fact that the carrier had occasionally stopped its train at a road crossing 135 feet from the regular station did not make such crossing a stopping place.

---

*As to effect of signaling car to make one a passenger, see notes in 13 L. R. A. (N. S.) 283; L. R. A. 1916C, 1022.

On duty to hold train for passenger seen approaching station, see note in 31 L. R. A. (N. S.) 442.

As to negligence of passenger in getting on or off moving train, see notes in 21 L. R. A. 356; 22 L. R. A. (N. S.) 757; L. R. A. 1915C, 186.

Reporter.

Carriers—Receiving Passengers—Places.

8. A carrier is not bound to receive passengers otherwise than at places provided for that purpose.

Carriers—"Passengers"—Signaling Car to Stop.

9. The mere act of an intending passenger in signaling the motorman on the electric train at a road crossing 135 feet from the regular stop did not make him a passenger.

Carriers—"Passengers"—Signaling Car to Stop.

10. Where plaintiff, intending to board a train, went to the station, and, when the train came in, desiring to speak to someone 100 feet away, asked the conductor to wait a minute, which the conductor conditionally agreed to do, and the train started, and plaintiff signaled the motorman, the mere fact that the motorman nodded his head did not make plaintiff a passenger, so as to warrant recovery for injuries in attempting to board the moving cars.

From Clackamas: JAMES U. CAMPBELL, Judge.

Department 1.

Acting through his guardian *ad litem,* Lionel C. Palmer, a minor about sixteen years of age, sued the defendant for damages resulting from a serious injury received by him on July 11, 1916, while attempting to board a moving train. The plaintiff was nonsuited and then appealed.

The Willamette Valley Southern Railway Company owns and operates an electric railway line between Oregon City and Mt. Angel. The line runs through the town of Molalla, where a depot is maintained, and continues in a southwesterly direction to and past a station called Ogle, located about two and one half miles from Molalla.

The plaintiff lived with his parents near Ogle, but he attended high school in Molalla, and when school closed he worked in a garage conducted by O. K. Cole in Molalla. He generally traveled on the electric train when going from his home to Molalla, or when returning to his home after school was out or at the end of his day's work. He had boarded the train "half a dozen times or more" at Ogle while the train

was in motion, and he had alighted from the train "many times without it stopping." On these occasions when he boarded or alighted from a moving car, the train was going between two and four miles an hour. He "felt it was all right to get on the cars when they were moving * * when the conductor told me it was all right." However, the plaintiff had boarded the train while in motion "once or twice" before the conductor told him "it was all right." On one occasion when the train was approaching Ogle, the conductor asked the plaintiff whether he could "get off without stopping"; the plaintiff answered, "I guess so," and the conductor said: "All right, then," and so the plaintiff "stepped off." However, before the plaintiff stepped off the conductor said:

"When you step off be sure to step with the train. It is safe to step off the train if you step the way the train is going; but if you step away from it, and step out, you are more apt to get hurt. Step with it and it is all right."

The plaintiff stated that he thought on the different occasions when he boarded or alighted from the train while in motion "it was going between two and four miles an hour," and he also testified that on each of such occasions the train was in charge of the same motorman who had charge of it on July 11th, and that although he never knew the name of the motorman, he "was acquainted with him by sight." The motorman had seen the plaintiff going to and from school, when he walked and the motorman "always waved his hand when he passed."

The railway track proceeds in a southerly direction past the depot in Molalla and crosses a county road which runs east and west. As it leaves the depot the track describes a slight curve and does not again

straighten out into a tangent until after crossing the county road. The travel along the county road follows the center line; and a sidewalk about five feet in width is laid along the north line of the right of way of the highway. The sidewalk crosses a ditch or trench which adjoins and parallels the track for a distance of probably 20 or 30 feet. It is 135 feet from the depot to the sidewalk and 20 feet from the sidewalk to the center of the highway. Edwin Woodwarth testified that on one occasion a south-bound train stopped at the road crossing to permit him and a companion to board the train. The plaintiff's father said that he had seen the train stop two different times "for people to get off and on." The plaintiff testified that he had seen the train stop at the crossing "not less than three times" and take on passengers.

A few minutes after 8 P. M. on June 11, 1916, the plaintiff went to the depot at Molalla with the intention of riding as a passenger on the train to Ogle. The south-bound train was about half an hour late. The plaintiff did not purchase a ticket because there was no agent at the depot; but he had money with which to pay his fare. He had been in charge of the garage that day during the absence of Cole, his employer, and had taken in about ten dollars. The plaintiff wanted to deliver this money to his employer, and after arriving at the depot the plaintiff went to the county road and watched for Cole. He saw Cole coming in an automobile along the road from the west toward the railroad crossing, and upon looking north "down the track" saw the train approaching the depot. The plaintiff testified that Cole and the train "were both coming at the same rate of speed and about the same distance from the station, and so I waved to him. I waited until he got close and signaled to

him to stop * * he just came over the track when
the car came and I went back and the car was just com-
ing in.    The brakeman had not stepped down yet, but
when the car stopped he stepped down and I went up
to him and tapped him on the shoulder and * * he
looked around and I said, 'Will you wait for me just
a minute?'    'Yes,' he said, 'if you don't make your
minute too long.'    So I went back to the county road
* * ran there.    I had the money in my hand and
handed it to Mr. Cole and told him I would keep ten
cents to pay my way, and then I whirled and * * when
I turned and started back they [the cars] were moving
and coming towards me.''

When he turned around the train was ''over half-
way'' to the sidewalk and he stated that he ''went
fast'' back to the sidewalk, waved his hand at the
motorman as a signal that he intended to board, and
when he reached the sidewalk he saw that the front
of the train was ''eight, ten or probably fifteen feet''
from him and so he stopped on the sidewalk. Re-
ferring to the motorman the plaintiff testified: ''I
saw him when he came up close by me.   He nodded at
me as though he knew me.''   When the plaintiff
stopped on the sidewalk the train was ''going three,
four or probably five miles an hour at the fastest.''
The plaintiff had a small dinner-pail on one arm and
when the rear of the first car came to him the plain-
tiff ''took hold of the upright handles'' on each side
of the door and just as he ''took hold'' the train gave
''an awful jerk, twice as hard as it had ever jerked
before,'' breaking his hold and throwing him between
the cars.   He explained that he did not get his feet
on the steps when he ''took hold * * because it was
going faster than I expected it to be going, and it
threw me under.''   Referring to the speed of the
train, the plaintiff said as the front end of the first

car passed him the train was "going the same rate as it was coming" when he stopped on the sidewalk; that he did not detect any "slowing up of the speed" when the front end of the first car passed him; and that it did not appear to be gaining in speed until, as he expressed it: "Just as soon as I took hold it took a jerk and I knew it was gaining speed." When speaking of the speed at which the train was usually run from the depot to the county road, two witnesses said it was "comparatively slow," another witness described it as "rather slow" and the plaintiff estimated it at "four or five miles per hour." The plaintiff says that when the front end of the first car passed him the train was going at the rate of four or five miles per hour; he alleges in his complaint that at and immediately prior to the time he attempted to board the train the speed of the train was suddenly increased "so that said cars were moving at a dangerous rate of speed of eight or ten miles per hour"; and he testified that at the time he attempted to board the car it was "then running from eight to ten miles per hour," although he thought when he "took hold" that the train was going at the same rate of speed as it was when the front end passed him."

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Leroy Lomax.*

For respondent there was a brief over the names of *Mr. O. D. Eby* and *Mr. Frank J. Lonergan,* with an oral argument by *Mr. Eby.*

HARRIS, J.—The plaintiff must necessarily fail unless the defendant violated some duty owing to him and thus caused the injury. The plaintiff insists that

he occupied the position of a passenger and that it was a question for the jury to determine whether his attempt to board the train was an act of negligence causing or contributing to the °injury. The defendant contends that the plaintiff was properly nonsuited because: (1) He did not possess the rights of a passenger when he attempted to board the train; and (2) even though he be treated as a passenger, nevertheless his attempt to board a moving train was negligence *per se.*

1–3. Stating the rule in general terms, it may be said that a person places himself in the position of an intending passenger when he enters upon a carrier's premises with the *bona fide* intention of becoming a passenger and awaits the arrival of his train at a proper place, in a proper manner and within a reasonable time before the arrival of such train: *Du Bose v. Atlantic Coast Line R. Co.,* 81 S. C. 271 (62 S. E. 255); *Abbot* v. *Oregon R. Co.,* 46 Or. 549, 561 (80 Pac. 1012, 114 Am. St. Rep. 885, 7 Ann. Cas. 961, 1 L. R. A. (N. S.) 851); 10 C. J. 613. It may be assumed, therefore, that the plaintiff acquired the rights of an intending passenger when he went to the depot for the purpose of taking the train to Ogle. The carrier had provided a depot and grounds beside the track where intending passengers could await the arrival of trains or board them upon their arrival; and so long as the plaintiff was at or in the depot or on the grounds which the carrier had provided for passengers he was entitled to the care due to intending passengers. Among the duties owing from the carrier to intending passengers is the duty to stop all trains, scheduled to stop, at designated places, and therefore it became the duty of defendant to stop its train at the usual stopping place in Molalla; and hav-

ing stopped its train it was incumbent upon the carrier to keep the cars standing for such time as was reasonably necessary to enable intending passengers, in the exercise of reasonable diligence on their part, to board the train. However, after having waited a reasonable time for intending passengers to board the train, a carrier is not as a general rule obliged to wait longer for any belated person: *Mitchell* v. *Augusta & A. R. Co.,* 87 S. C. 375 (69 S. E. 664, 31 L. R. A. (N. S.) 442). The plaintiff does not claim the train was not stopped sufficiently long to enable intending passengers who were at the depot to board the train and consequently it must be assumed that the carrier stopped the train at the depot long enough to permit intending passengers in the exercise of reasonable diligence to get aboard.

The plaintiff argues that the carrier agreed to wait for him "a minute" if he did not make the minute "too long." According to the testimony of the plaintiff he could have delivered the money to Cole and returned to the depot where the train was standing within 18 or 20 seconds from the time he spoke to the brakeman, and hence it will be assumed that the carrier did not wait as long as the brakeman said he would wait. It must be remembered that there is no evidence to show that the brakeman or any member of the crew knew why the plaintiff wished the brakeman to wait or what he wished to do or where he wished to go or that he had gone anywhere. It will be recalled, too, that the track leaves the depot on a curve, and, while there is no evidence to show the degree of the curve or whether a person standing on the depot platform could have seen the plaintiff when at the county road, it does appear from the evidence that although the plaintiff was on the same side of

the track as the depot, he was on the outer and not on the inner side of the curve.

4. While waiting at the depot a standing train serves as an invitation to all intending passengers to board it, and the invitation carries with it an assurance that the passenger may board the train in safety: *Jones* v. *New York Central & H. R. R. Co.*, 156 N. Y. 187 (50 N. E. 856, 41 L. R. A. 490); but starting the train ordinarily operates as a withdrawal of the invitation: *Tompkins* v. *Portland Ry., L. & P. Co.*, 77 Or. 174, 179 (150 Pac. 758); *Chaffee* v. *Old Colony R. R. Co.*, 17 R. I. 658 (24 Atl. 141); 2 White on Personal Injuries on Railroads, § 783. When therefore defendant started its train from the depot it withdrew its invitation to board the train. There is an irreconcilable conflict between the authorities upon the question as to whether it is negligence as a matter of law for an intending passenger to board a moving train. In some jurisdictions it is held that it is negligence *per se* to attempt to board a moving train, while in other jurisdictions it is a question for the jury unless the speed was so great as to make the attempt obviously dangerous. The presence or absence of an invitation or direction given by a member of the train crew to the intending passenger to board a moving train, and the presence or absence of knowledge or consent upon the part of the carrier are frequently important and sometimes controlling factors; and ofttimes the failure of the train to stop a reasonable time is a material element; 5 R. C. L. 36; *Hunter* v. *Cooperstown & S. V. R. Co.*, 112 N. Y. 371 (19 N. E. 820, 8 Am. St. Rep. 752, 2 L. R. A. 832); *Kansas & G. S. L. Ry. Co.* v. *Dorough*, 72 Tex. 108; *Distler* v. *Long Island R. Co.*, 151 N. Y. 424 (45 N. E. 937, 35 L. R. A. 762); *Hoylman* v. *Kanawha & M. R. Co.*, 65

W. Va. 264 (64 S. E. 536, 17 Ann. Cas. 1149, 22 L. R. A. (N. S.) 741) ; *Atchison, T. & S. F. Ry. Co.* v. *Holloway,* 71 Kan. 1 (80 Pac. 31, 114 Am. St. Rep. 462) ; *Carr* v. *Eel River & E. R. Co.,* 98 Cal. 366 (33 Pac. 213, 21 L. R. A. 354) ; *Browne* v. *Raleigh & G. R. Co.,* 108 N. C. 34 (12 S. E. 958) ; *Gannon* v. *Chicago, R. I. & P. Ry. Co.,* 141 Iowa, 37 (117 N. W. 966, 23 L. R. A. (N. S.) 1061). However, in the instant case it will not be necessary to determine whether it would have been negligence *per se* for the plaintiff to have attempted to board a moving train when in front of the depot and at a place provided for passengers.

5, 6. Although the plaintiff became an intending passenger when he entered upon the depot grounds for the purpose of taking the train to Ogle, yet it does not follow that he was necessarily entitled to the rights of a passenger at all times afterwards. It is not the rule that once a passenger always a passenger: *Du Bose* v. *Atlantic Coast Line R. Co.,* 81 S. C. 271 (62 S. E. 255) ; 10 C. J. 612. The plaintiff went upon the county road and while there his status as a passenger was at least suspended. When he stood upon the sidewalk he was not in a place provided by the carrier for the use of intending passengers and while he stood there he was not in a place where he could claim the rights of an intending passenger, and consequently the carrier was not under any obligation to stop or to slow the train at the crossing, even though it be conceded that the carrier violated its contract when it refused to wait "a minute" at the depot. If the rights of an intending passenger, which were acquired by the plaintiff when he entered upon the depot premises, did not follow him when he left those premises and did not remain with him while standing upon the sidewalk, then he cannot successfully claim the rights of

an intending passenger unless waving his arm to the motorman and the nod of the latter reclothed him with those rights.

With the single exception of the motorman no member of the train crew either saw the defendant while he was in the county road or on the sidewalk, or even knew that he was there and, hence, the status of passenger was not again resumed unless it was created by the acts of the plaintiff and the motorman. Although it was using electric power the defendant was operating a train with scheduled stops and was governed by the rules applicable to steam trains: 10 C. J. 945; 2 Shearman & Redfield on Neg. (6 ed.), 1441.

7–9. The county road was not a regular stopping place nor even a flag station. It is true that the carrier had stopped the train at the road as many as six times to permit passengers to board or alight from the train, but those acts of accommodation did not make the highway a stopping place when a depot was maintained 135 feet from the crossing. A carrier is not bound to receive passengers otherwise than at places provided for that purpose: *Haase* v. *Oregon Ry. & N. Co.,* 19 Or. 354, 361 (24 Pac. 238). The plaintiff could not by the mere giving of a signal, convert the county road into a passenger station. The act of signaling to the motorman did not confer the rights of a passenger upon the plaintiff. The plaintiff admits that the train did not slacken its speed and that from the time he first saw it when he turned around in the road it was traveling between three and five miles an hour; and he also admits that he did not expect the train to stop.

10. The plaintiff contends that he became entitled to the rights of a passenger when the motorman acknowledged his signal. But there is no evidence that the

motorman acknowledged his signal or in any way indicated an intention to accept the plaintiff as a passenger. The most the motorman did was to indicate that he knew the plaintiff just as he had done on half a dozen previous occasions when the train passed the plaintiff, for in the language of the plaintiff himself the motorman "nodded at me as though he knew me." The plaintiff was not invited to board the train at the crossing. The carrier did not expressly or impliedly contract to receive him as a passenger at the crossing. There is no evidence to show that any member of the train crew saw the plaintiff attempt to board the train, or knew that he intended to board the train, or by word or act indicated an intention to accept him as a passenger at the county road; and, therefore, the defendant is not liable for the injury suffered by the plaintiff: *Baltimore Traction Co.* v. *State,* 78 Md. 409 (28 Atl. 397); *Garvey* v. *Rhode Island Co.,* 26 R. I. 80 (58 Atl. 456); *Georgia & F. R. Co.* v. *Tapley,* 144 Ga. 453 (87 S. E. 473, L. R. A. 1916C, 1020); *Mitchell* v. *Augusta & A. R. Co.,* 87 S. C. 375 (69 S. E. 664, 31 L. R. A. (N. S.) 442); 10 C. J. 617.

The judgment of the Circuit Court is correct, and it is affirmed.    AFFIRMED.

McBRIDE, C. J., BENSON and BURNETT, JJ., concur.