ARTHUR K. FLEMING, PLAINTIFF-APPELLANT, v. CONNECTICUT GENERAL INSURANCE COMPANY, DEFENDANT-RESPONDENT.

Submitted May 31, 1935—Decided October 9, 1935.

For the appellant, *Donald B. Munsick* and *W. Stanley Naughright.*

For the respondent, *Arthur T. Vanderbilt.*

The opinion of the court was delivered by

HEHER, J.   The challenged judgment was entered on a directed verdict in favor of defendant.   The pleaded cause of action is grounded upon a policy of insurance issued by defendant, indemnifying plaintiff "against loss resulting directly, and independently of all other causes, from bodily injuries effected solely through accidental means."   Plaintiff fell or was thrown under the wheels of a train of the Erie Railroad Company, at its Arlington station, and suffered the loss of both feet.   The indemnity provided by the policy for such an injury was the sum of $10,000, or, in lieu thereof, at the insured's option, a "weekly indemnity ($50) so long as he lives."   Plaintiff elected to take the latter, and makes claim for treble indemnity under the following clause of the policy:

"Section IV:   The Company will pay triple the amount, otherwise payable under Sections I, II or III for any loss caused or sustained as follows: while the Insured is a passenger in or on a public conveyance provided by a common carrier for passenger service (including the platform, steps or running board of railway or street railway cars); * * *."

Defendant concedes liability for single indemnity only. It states the sole question raised on appeal to be "whether

or not plaintiff was a *passenger* in or *on* the train in question, including the steps thereof, at the time the accident occurred," within the intendment of the triple indemnity provision of the policy. The trial judge, conceiving that the case is ruled by *Anable* v. *Fidelity and Casualty Co.,* 73 *N. J. L.* 320; *affirmed,* 74 *Id.* 686, and *Bernardine* v. *Erie Railroad Co.,* 110 *Id.* 338, resolved this inquiry in the negative.

The proofs tended to establish the following matters of fact: On March 12th, 1931, plaintiff purchased from the Erie Railroad Company a ticket entitling him to transportation from Jersey City to Bloomfield. He boarded a train that departed from the Jersey City station at nine-forty-four P. M. Before the train reached Arlington, an intermediate station stop, he indicated to one of the trainmen a purpose to leave the train and invite a friend or two he thought might possibly be there to accompany him to a business meeting to be held that evening in Bloomfield. He had previously lived in Arlington. Taking his ticket, he left the train when it halted at the customary station stop.

The *locus* consisted of three parallel tracks, extending east and west, with the station on the southerly side thereof. The most southerly track, immediately adjacent to the station platform, was devoted to the running of eastbound trains, while the adjoining track to the north carried the west-bound trains, the direction in which the train in question was moving. The third and most northerly track was used as a siding.

Plaintiff descended from the train to the station platform, and walked westerly toward Elm street, which intersects the railroad a short distance to the west of the station. Finding no acquaintance there, he crossed over to the northerly side of the train, using the vestibule of the head coach for the purpose (the highway crossing itself was blocked by the standing train), and, discovering none of his friends there, he proceeded along the north side of the west-bound track, between it and the siding, with the intention of reboarding the train and continuing his journey to Bloomfield.

This is his version of the circumstances attending the accident: "When I had walked about half the distance of that

car, I should say somewhere near the middle, it seemed that I heard one of the trainmen call, 'all aboard,' on the opposite side, so I hastened—I walked a little bit faster toward the center, and when I was almost within reach of the handrail, I heard, or I seemed to hear, two little blasts of a whistle or signal—something to that effect, and then the train had been started, and then from that point I proceeded to reboard the train. * * * I took hold of the grabrail or handrail with my right hand—that is at the front end of the rear coach, the step on the right-hand side—the right-hand of the rear coach. I grabbed hold of the grabrail with my right hand, and swung my left foot up to the step, and then about that time or during the process of swinging up, my right foot slipped on something—a tie or some object. Of course, I don't know. I assumed it was a tie, but it slipped, and that threw me slightly off my balance, causing the foot to slip off the step and my shin to strike a car step or tread—probably a tread. It struck it a pretty good blow—enough to graze it. Then I naturally fell forward on the step on my knee, and I grabbed the diagonal handrail with my left hand, so that I would be drawn on the steps with both knees about that time. The train started up during this attempt to adjust myself, and, of course, there was a jerk—there is somewhat of a jerk when any train starts, and I fell off balance and struck my head on some object there over the left ear (indicating) which created further difficulties for me. Q. What do you mean? You say 'which created further difficulties for me.' A. Well, I mean it dazed me somewhat, and then my left knee slipped off the step and became involved with one of the wheels, apparently. Well, it did become involved with one of the wheels, because it was crushed at that time. There was a violent shock to my nerves, like a clap of thunder, and my head roared. Well, at that particular moment, then I was still holding on, and this knee (indicating) was resting, perhaps, on the step. Q. Indicating what knee? A. My right knee. I was still holding, and there was a gradual—it seemed to be pulling on this one, and in some manner it pulled me clear. After a little time the right one slid under, and there was another clap in my ears resulting from this

shock, which was also worse than the first, and that threw me clear of the steps entirely. That was out quite some distance, however, from the box car. I was almost to Elm street."

Defendant points to what it conceives to have been conflicting statements made by plaintiff in his original report of the accident to it, to police officers and railroad employes, and on the witness stand. It seems to be conceded that his testimony at the trial was, in effect, that "as he attempted to reboard the train his right foot slipped on a tie or something, and caused his left foot to slip *from the step* and his *knee landed on the step instead of his foot*," but it is insisted that this evidence was nullified by an admission, on cross-examination, that "what he was testifying to in the court was not his recollection of what occurred at the time, but was a story, the details of which he made up some time later when he went back to look at the scene of the accident," and that the trial judge was therefore justified in directing a verdict for defendant on the ground that "the proof disclosed that the plaintiff was not a passenger in or on the train, including the steps thereof, within the meaning of section 4 of the policy."

We find no admission on cross-examination tending to support the claim that the plaintiff, in testifying that he was ascending the car steps when the accident befell him, was not drawing upon his personal knowledge of what had occurred. The testimony in the nature of subsequently drawn deductions seems to have been confined to what occurred after he had lost his balance while on the steps leading to the car platform. He later testified on cross-examination: "*Q.* And your right foot caught in a cross tie or some other obstruction? *A.* Oh, I don't think it necessarily caught. I mean this was all very quick, you understand. It slipped. *Q.* That was as you were bringing your left foot up to the first step? *A. About the time the left foot came on the bottom tread. Q.* And then what happened to your left foot? *A. The left foot slid off the step, striking my shin.* * * * There is—incidentally, that scar is there yet. *Q.* So your left foot slipped down off the first step and you hit your left shin and bruised it severely? *A.* Yes, that was when I came forward

like that (indicating) on my knees on the step. *Q.* And then what happened? *A.* Well, that is when I took hold of the diagonal—I don't mean the up and down grabrail, *but the one that goes up along the steps,* with my left hand, and drew my knee to the—on the bottom tread—that is, had my right leg down, and that is about the time this jolt or the starting of the train cracked my head against the end of the car. *Q.* And then, as I understand it, your two knees were pressing against the step? *A. They were on the bottom tread.* The trousers conclusively show the dirt there. *They were right on the bottom tread, resting there, and they were on there until I was carried about thirty feet or forty feet.*"

The bill of particulars, while not stating the occurrence with this detail, advised the defendant that the plaintiff was thrown "off balance" when his "right foot slipped on a cross tie, or some obstruction, * * * after grasping the railing when mounting the steps." There is no substantial difference between it and the original report of the accident made by the plaintiff to the defendant. One of the latter's witnesses, Dineen, testified that the train had moved only three feet when plaintiff "started to get on," and that he "then started to mount the second car." Suffice it to say, as to the statements alleged to have been made by the plaintiff at variance with his testimony at the trial, a jury question was presented.

Defendant maintains, *in limine,* that this was a mere unsuccessful attempt "to board a train which had begun to move," and that plaintiff was not a "passenger in the sense that that word is commonly used." It is insisted that "at no time did the plaintiff ever get his foot on the step," and that, even so, "no part of his weight rested 'in or on' * * * the steps of the conveyance." The decisive test, defendant argues, is whether plaintiff "had his weight resting on the step." It distinguishes the case of *Aschenbrenner* v. *United States Fidelity and Guaranty Co.,* 292 *U. S.* 80; 54 *S. Ct.* 590; 78 *L. Ed.* 1137, and urges that, to meet the standard there laid down, it was essential that the "intending passenger" have "both feet firmly planted on the step," and "all his weight at rest on the step."

These contentions are manifestly devoid of foundation. As pointed out, the train had moved a distance of only three feet when plaintiff attempted to board it. According to him, while mounting the car steps, with his right hand on the handrail, and his left foot on the first step, his right foot "slipped on something," and he was thrown "slightly off his balance." His left foot "slid off the step;" his shin struck "a car step or tread," and he "fell forward on the step on his knees." He then took hold of the inside handrail, and while he was on his knees, "on the bottom tread," the train jolted. His head came in violent contact with "some object," and in a dazed condition he fell or was thrown under the wheels.

It thus appears that plaintiff's evidence will sustain the finding that he was, to all intents and purposes, "on the steps" of the car when the accident befell him. Whether, under all the circumstances, such a finding ought to be made, is within the exclusive province of the tribunal set up to resolve the issues of fact.

The distinction thus drawn by defendant attributes to the parties a nicety of discrimination in defining liability for treble indemnity that is not reflected in the choice of language employed to express the common intention. It is one that will, in accordance with the well recognized canon of construction to be hereafter adverted to, be rejected unless the common purpose to make it is expressed in clear and unambiguous language.

But it is the insistence of defendant that, even so, plaintiff concededly attempted to board the train while it was in motion, and from the "unguarded" northerly side thereof, which had no platform and was not designed for the use of passengers boarding or departing from its train, and that, for each of these reasons, the plaintiff was not a "passenger" within the intendment of the policy provision. It is said, in respect of the latter reason, that "the approach from the unguarded side increased the chances that the train would start moving without him, as well as increasing the risk of a successful leap to safety," and that the "policy contemplates that the assured will use the facilities provided by the com-

mon carrier." If that be so, it is difficult to perceive the theory of the rejection, on defendant's motion, of all evidence tending to show that the northerly side of the west-bound track was generally used, with the knowledge, acquiescence and sanction of the railroad company, by passengers boarding and leaving west-bound trains. It is to be observed, in this connection, that the vestibule doors on the northerly side of the cars were open, permitting of access from that side.

However, this claim is likewise without merit. The passenger-carrier relationship had indubitably commenced; and the inquiry is whether it had subsistence at the time of the occurrence of the accident. This must be resolved in the affirmative. It is hardly open to question that the relationship had not terminated. The contract obliged the carrier to transport plaintiff to Bloomfield; and this had manifestly not been accomplished. There was no stipulation that a departure from the train, while at a standstill at an intermediate station, either for the purpose of making a purchase at the station, or to relax in the open air, would terminate the relationship. This is of common occurrence, and in practice the parties do not contemplate a surrender thereby of the passenger status.

The trial judge mistakenly applied to the case in hand the rule laid down in some jurisdictions of this country, in personal injury suits against common carriers instituted by persons who, intending to be passengers, were injured while attempting to mount the steps of a moving train, that "the implied invitation to board the train is withdrawn when it begins to move, and that the duty of the carrier to exercise a high degree of care toward its passengers does not attach in such circumstances, because one seeking to board a moving train does not become a passenger until he reaches a place of safety." *Trapnell* v. *Hines,* 268 *Fed. Rep.* 504; *Fels* v. *East St. Louis and S. Railway,* 275 *Id.* 881; *Palmer* v. *Willamette Valley Southern Railroad Co.,* 88 *Or.* 322; 171 *Pac. Rep.* 1169; *Chaffee* v. *Old Colony Railroad Co.,* 17 *R. I.* 658; 24 *Atl. Rep.* 141; *Speaks* v. *Metropolitan Railroad Co. (Mo.),* 166 *S. W. Rep.* 864; *Mathews* v. *Metropolitan Street Railroad Co.,* 156 *Mo. App.* 715; 137 *S. W. Rep.* 1003; *Illinois Cen-*

*tral Railroad Co.* v. *Cotter,* 31 *Ky. L. Rep.* 679; 103 *S. W. Rep.* 279. But these cases all deal with the commencement of the passenger-carrier relationship, and some are expressly predicated upon the entire absence of evidence that the carrier "agreed to accept as a passenger" the person asserting that relationship, and therefore the lack of one of the requisite elements of a contract creating that relationship.

The trial judge thereby confused the passenger status itself with the breach of a duty growing out of it. He thus made liability for personal injuries, predicated of negligence, the decisive test of the existence of the relationship itself; he assumed that negligence by the passsenger was conclusive of its termination or suspension.

Of course, the evidence in a given case may disclose nothing to show a breach of the carrier's duty to exercise a high degree of care for the passenger's safety; but that is a far different question which presupposes the existence of the passenger-carrier status. That inquiry is not material to the issue framed in the instant case. The contractual indemnification against loss sustained by such an accidental injury does not depend either upon the carrier's negligence or the passenger's exercise of due care.

As pointed out in *Aschenbrenner* v. *United States Fidelity and Guaranty Co., supra,* a case involving a somewhat similar indemnity contract, while an intending passenger injured in attempting to board a moving train, without an invitation to do so, is not ordinarily entitled to recover from the carrier for injuries thereby sustained, the passenger-carrier relationship may subsist when the person seeking conveyance is not actually on the transportation facility. See *Exton* v. *Central Railroad Co.,* 62 *N. J. L.* 7; *affirmed,* 63 *Id.* 356; *Warner* v. *Baltimore and Ohio Railroad Co.,* 168 *U. S.* 339; 18 *S. Ct.* 68; 42 *L. Ed.* 491; *Atchison, T. and S. F. Railroad Co.* v. *Holloway,* 71 *Kan.* 1; 80 *Pac. Rep.* 31; *Chicago and E. I. Railroad Co.* v. *Jennings,* 190 *Ill.* 478; 60 *N. E. Rep.* 818. It was further observed in the cited case that, both where the insured passenger alighted from the train at an intermediate stop, and was injured in attempting to reboard it after it was again put in motion, and where the insured, in beginning his

journey, was injured in attempting to board a moving train, recovery for the consequent injuries would be barred by reason of insured's negligence without indulging in the "artificial assumption of a hiatus in that relationship during the brief interval required for boarding the train," citing *Wharton* v. *New York Life Insurance Co.*, 178 *N. C.* 135; 100 *S. E. Rep.* 266; *Fidelity, &c., Co.* v. *Morrison*, 129 *Ill. App.* 360.

But, as remarked by Mr. Justice Stone, the question is, after all, one of interpretation of the contract between the parties. And, in such an inquiry, we are guided by the settled canon of construction that, where words or other manifestations of intention bear more than one reasonable meaning, they will be read most strongly *contra proferentem*, unless their use by him is prescribed by law. If the language employed is reasonably open to two constructions, that more favorable to the insured will be adopted. *Bullowa* v. *Thermoid Co.*, 114 *N. J. L.* 205; 176 *Atl. Rep.* 596; *Clott* v. *Prudential Insurance Company of America*, 114 *N. J. L.* 18; 175 *Atl. Rep.* 203; *affirmed*, 115 *N. J. L.* 114; 178 *Atl. Rep.* 747; *Rockmiss* v. *New Jersey Manufacturers' Fire Insurance Co.*, 112 *N. J. L.* 136. Applying this rule, and the familiar one that, unless it is obvious that the parties intended to employ the words in their technical connotation, they will be given the common or popular meaning, we have no difficulty in arriving at the common intention. Mr. Justice Stone gave to the word "passenger" in a like clause in the policy under consideration in the Aschenbrenner case, not "the technical meaning which may be assigned to it by the law of common carrier," but that which common speech imports—a "meaning which would at least include the insured who, with a ticket in his possession, was riding on the steps of the train." He continued: "In its usual popular significance the term, when applied to one riding a train, indicates a traveler, intending to be transported for hire or upon contract with the carrier, and distinguishes him from those employed to render service in connection with the journey." We concur in this interpretation.

And it matters not, as pointed out in the cited case, that

the clause in question provides for treble indemnity. This was patently an inducement to the making of the contract; and we do not find in the context any suggestion that the words 'were employed in their narrow technical sense rather than in their popular significance and usage. In the words of Mr. Justice Stone, in the Aschenbrenner case, "the steps of a car are specifically included in the place where injury insured against may occur." And, as heretofore noted, liability does not depend upon the exercise of due care by the passenger. "He who speaks should speak plainly, or the other party may explain to his own advantage." *State* v. *Worthington,* 7 *Ohio* 171. This is a corollary, in aphoristic style, of the stated secondary rules of construction applicable where ambiguous language is employed to express the understanding.

We perceive no analogy in the cases in this court relied upon by respondent: *Anable* v. *Fidelity and Casualty Co., supra; Bernardine* v. *Erie Railroad Co., supra.* In the former, the policy provided double indemnity for injuries received by the insured "while riding * * * as a passenger in or on a public conveyance," without more; and it was held that the insured, who "grasped" but was unable to "retain his hold" of a "handrail on the front platform of the last car" of a moving train, and was thrown under the wheels of the car, was not "riding as a passenger in or on a railroad train." Mr. Justice Reed said: "The insured was not in the car, nor was he on the car, nor on any part of a train, at the time of the injury. He had seized the handrail, but failed to hold it and fell down on the station platform. The language of the contract is that his injuries must have occurred while the insured was riding in or on a public conveyance. It seems impossible to bring the injury, as it happened, within the language of the contract, without departing from the plain and unambiguous words used in that instrument. To hold that the assured was in or on a car would be to say that a person who was injured while standing upon a railroad platform was in or on a car of the railroad, for it cannot be perceived how the fact that the assured had grasped a handrail while still on the platform constructively

put him in or on a car." And in the last cited case, it is clear that, under the circumstances presented, the passenger-carrier relationship had not arisen so as to impose upon the carrier the duty of exercising a high degree of care for the safety of the intending passenger.

Judgment reversed, and a *venire de novo* awarded.

*For affirmance*—TRENCHARD, CASE, HETFIELD, DEAR, WELLS, JJ. 5.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, WOLFSKEIL, RAFFERTY, JJ. 11.